**T. H. GREEN v. CITY OF ST. PETERSBURG, FLORIDA, a municipal corporation, RAYMOND RIDGELY, as City Manager of said City, and R. I. MATTHEWS, as superintendent of Mound Park Hospital, in St. Petersburg, Florida.**

17 So. (2nd) 517                                     January Term, 1944
April 11, 1944                                              En Banc

*Harris & Kooman,* for petitioner.

*Erle B. Askew, Lewis T. Wray* and *Harry I. Young,* for respondents.

TERRELL, J.:

The City of St. Petersburg owns and operates Mound Park Hospital. It is operated on a self supporting plan but all deficits in administration are paid from municipal funds. T. H. Green, a resident physician and taxpayer and member of the general staff of the hospital is permitted full use of its facilities for all purposes except the performance of major operations.

He made application for appointment to the associate surgical staff which would give him unrestricted use of the facilities of the hospital for all purposes but being refused

this request, he made demand on the City manager for permission to use the facilities of the hospital for the performance of major operations. This demand being refused, he filed his bill of complaint in the circuit court praying that the City be restricted from interference with him in the use of the facilities of the hospital for the performance of major operations. This is an appeal by certiorari from an order denying a motion for decree on the issues made by the bill and answer.

The primary question presented is whether or not petitioner, a resident physician and taxpayer of St. Petersburg, Florida, has a legal right to the unrestricted use of the facilities of Mound Park Hospital, for the performance of major operations on his patients.

Owning and administering hospitals was not a function of government under the Common Law. Sanction for their ownership must therefore be sought under the statute. Chapter 15505, Special Acts of 1931, authorizes the City of St. Petersburg to establish and maintain hospitals. Mound Park Hospital was constructed pursuant to this Act and is being operated as one of the administrative departments of the City. The City manager is clothed with power to prescribe rules and regulations for its administration and is required to make full report of its affairs in writing to the City council.

Mound Park Hospital is operated by the City in its corporate capacity. It is on the list of hospitals approved by the American Medical Association and the American College of Surgeons. To enjoy these valuable privileges, it is required to and does maintain a specified staff organization and prescribed rules governing said staff. These rules require that in order to secure the privileges of the hospital, physicians and surgeons be first placed on the junior surgical staff for a probationary period of not less than two years. They may then be appointed to the associate surgical staff where they are required to perform twenty major operations under competent supervision when they are awarded membership on the major surgical staff. Members of the major surgical staff are entitled to unrestricted use of the facilities of the hospital for major operations.

The reason for these rules is to establish and uphold the high standard of the hospital, to meet the requirements of the American Medical Association, the American College of Physicians and Surgeons, to insure those entering the hospital for treatment that they will secure skillful service and to protect the City and its taxpayers in the administration of the hospital. They are not for the purpose of discriminating against any physician but all are required to conform to them as a prerequisite to the use of its facilities for major operations.

The law is settled in this country that a municipality may regulate and control the operation of a hospital provided by it and that in the exercise of such power, it may exclude those not shown to have met its requirements. Richardson v. City of Miami, 144 Fla. 294, 198 So. 51. There can certainly be no question about the power of a municipality to prescribe reasonable rules and regulations defining qualification to practice the medical profession in a hospital provided by it. Hayman v. Galveston, 273 U. S. 414, 47 Sup. Ct. 363, 71 L. Ed. 714; Harris v. Thomas, Tex. Civ. App. ......, 217 S. W. 1068; See also City of Miami v. Oates, 152 Fla. 21, 10 So. (2nd) 721.

The record shows that appellant is on the general staff of Mound Park Hospital and as such is permitted to treat his patients and perform minor surgical operations. In other words, he has unrestricted use of the hospital for all purposes except the performance of major operations and objects to qualifying as a major surgeon under the rules of the hospital in order to acquire this privilege, notwithstanding every other physician who practices major surgery with its facilities has so qualified. He contends that he should be granted a privilege not given to the members of the medical profession generally.

To contend that being a resident taxpayer and practicing physician of the City gives him a constitutional right to the unrestricted use of the facilities of a hospital provided by the City presents a test of our constitutional theory that we have not heretofore been confronted with. It is a test that takes more for a solvent than mere dogma, or a pair scissors, a pot

of paste and an ipsi dixit. The practice of major surgery is a highly specialized field and is recognized as a delicate art. The majority of physicians admit that it requires special skill and training and do not [pretend to] enter that field. It is an art that cannot be acquired by technical training alone but most come through actual practice and experience. Skill in materia medica in no sense connotes skill in major surgery. It is utterly futile to contend in our day that one be permitted to take a scalpel in hand and explore the cranium, the thorax, or the abdomen and patch the viscera, remove a tumor or amputate a limb before he demonstrates his qualification to do so. Most assuredly when a municipality furnishes a hospital, operating room and other facilities for doing this and is responsible to patients for the negligent use of these facilities, it has a right to know that they are placed in the hands of an expert. If this is not true, the City and the taxpayer have no protection whatever.

It would project the doctrine of freedom and equality into unwarranted areas to hold that one could practice major surgery with facilities furnished by the City when he has nothing more than a diploma from a medical school and a certificate from the State Board of Medical Examiners to warrant his skill in that field. A lawyer with these credentials would not be employed to make out a complicated income tax return; a teacher with the equivalent of this would not be employed to teach calculus or theology; a farm demonstration agent with any amount of academic training would not be employed by the county before showing peculiar training in agriculture and so we might add cases ad infinitum when special training is prerequisite to employment in specialized fields.

The doctrine of freedom as employed in the democratic state has reference to man's free agency, to freedom of opportunity, and equality before the law, to freedom to own property, to trade with whom he will, to go and come as he pleases, to worship God as his conscience dictates, to marry whom he or she can and to speak his mind, if he has one, on any question. There was nothing more fundamental in the Jeffersonian concept of democracy than this, that democratic

institutions must keep pace with new truths and new discoveries and as these advance, opinions must change and advance with them. To the end that these things be accomplished, said Jefferson, nature has wisely provided an aristocracy of virtue and talent to direct the interests of society. The first concern of a free society is the welfare of the individual, the intelligent administration of his social, political, and cultural interests.

Constitutional guaranties were not designed to intercept or stalemate progress in these factors; neither were they intended to hamper a community in raising the standard of its schools, hospitals, and other institutions as high as reason and circumstances dictate. In this case, the people of. St. Petersburg have elected to own and support a hospital of approved high standards and none of them are here complaining. Appellant says he should not be required to bring himself in rapport with the standards imposed by the community in which he proposes to practice. He does not intimate that the standards imposed are too high or out of line with those generally approved for the conduct of a first class hospital. If this thesis be sound, then there is no standard of excellence that the City can impose to protect itself against the assault made.

Constitutional guaranties, individual diversities, and the public welfare cannot always be reconciled but when they do clash, the public welfare is paramount and the right of free enterprise should be construed to preserve that. It may be that the means provided in this case to reveal the "aristocracy of virtue and talent" to do major surgery are crude but it is not shown that they do not afford a measure of protection to the public and certainly they are ample to require that major surgery be done by the latest and best approved standards. No practitioner has a right to exploit the art under any other. When the City furnishes the facilities and takes the risk against their negligent use, it is not too much to require that he who wields the knife does so in the philosophy of the twentieth rather than in that of the eighteenth century.

It is also contended that the rules and regulations called

in question should be promulgated by the City council, that the City manager was without authority to do this, that in technical construction they are arbitrary and unreasonable as to petitioner and that they are subject to administration in such an arbitrary and unreasonable manner as to bar him from the use of the hospital as a major surgeon, should he qualify in other respects as such.

As to the first contention, it is sufficient to say that the City charter authorizes the City council to conduct all the administrative departments of the City through the City manager who is fully authorized to promulgate rules and regulations for the conduct of the hospital. The Legislature was empowered to authorize this. Whether or not it was the best and wisest way is no concern of ours.

On the charge that the rules and regulations are unreasonable and arbitrary as to appellant, his objection is based on pure speculation as to the course pursued by those vested with the prerogative of administering the rules. We think this question has been prematurely raised. Unquestionably one should be given ample opportunity to qualify as a major surgeon under the rules of the hospital. If the rules are arbitrarily enforced in a way to bar instead of to qualify him he will then have reason to raise this question but we refuse to indulge the presumption that he will not be treated fairly. He is well within his right to seek relief against unreasonable application of a rule but not against one that requires the same standard of excellence from him that it requires of all in his class. If he can demonstrate to the City manager that he is the skilled surgeon that he claims to be and has in all respects complied with the prerequisites imposed by the hospital, he should be given consideration for this but the mere fact of being a physician and taxpayer in the City is insufficient warrant for the relief sought.

For these reasons, the petition for certiorari is denied and the judgment below is affirmed.

BROWN, THOMAS, ADAMS and SEBRING, JJ., concur.

CHAPMAN, J., concurs specially.

BUFORD, C. J., dissents.

CHAPMAN, J., concurring specially:

In agreeing to the opinion and judgment in the case at bar as prepared by Mr. Justice TERRELL, I do so on the state of the record as presented to this Court. The challenged rules, obviously, were promulgated in behalf of the hospital and for the protection of patients undergoing major operations against possible unethical or unskilled licensed practitioners. It seems to me that such reasonable rules promote the interest of the public and general welfare and likewise encourages a high professional standard of requirements for major surgery. It is clear that these rules close the door against possible dope fiends, liquor heads, and practitioners not qualified to perform major surgical operations. The general interest of such patients must be protected simultaneously with advancement in the practice of surgery.

In agreeing to the opinion, I do not hold that the group of surgeons now practicing major surgery at the Mound Park Hospital have, possess or now exercise a monopoly on major surgery to the exclusion of other qualified surgeons patronizing the hospital. The petitioner, and others, are not foreclosed of the right to have litigated the question of whether or not these rules as adopted and in force create or establish a monopoly on major surgery in behalf of those now engaged in this line of professional activity at the Mound Park Hospital.

I do not think this petitioner, or others of a similar class, should be precluded from litigating the question of whether or not these rules are arbitrarily enforced for the use and benefit of those practicing major surgery as distinguished from the public interest or general welfare; neither should the petitioner, or others, be precluded from establishing in subsequent litigation that the operation of the hospital under the challenged rules deprives the petitioner, or others similarly situated, of legal rights recognized by law. Presented here is the simple question of whether or not these rules, as applied to the petitioner, are reasonable.