[Crim. No. 15866. In Bank. Nov. 22, 1972.]

THE PEOPLE, Plaintiff and Appellant, v.
ROBERT W. BARKSDALE, Defendant and Respondent.

**324**

---

## Counsel

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Edward P. O'Brien, Charles R. B. Kirk and Derald E. Granberg, Deputy Attorneys General, for Plaintiff and Appellant.

Musick, Peeler & Garrett, James E. Ludlam, Robert D. Girard, Hassard, Bonnington, Rogers & Huber, Howard Hassard, Lawrence W. Kessenick and James F. Kemp as Amici Curiae on behalf of Plaintiff and Appellant.

Mintz, Giller, Himmelman & Mintz, Herman W. Mintz and Morton B. Goldstein for Defendant and Respondent.

A. L. Wirin, Fred Okrand, Roy Lucas, Barbara Ashley Phillips, Pat Kowitz, Joan K. Bradford, Zad Leavy, Levinson, Rowen, Klein & Leavy, Norma G. Zarky, Alan F. Charles, Johnson C. Montgomery, Laurence R. Sperber, Paul N. Halvonik, Charles C. Marson, Terry J. Hatter, Jerome Levine, Roblin J. Williamson, Roland E. Brandel, August B. Rothschild, Jr., and Judith G. Kleinberg as Amici Curiae on behalf of Defendant and Respondent.

Walter R. Trinkaus, J. J. Brandlin, James E. Ryan, Ray E. McAllister, Andrews, Andrews, Thaxter & Jones, John F. Duff, Richard G. Logan, Curran, Golden, McDevitt & Martin and William R. Kennedy as Amici Curiae.

---

## Opinion

**WRIGHT, C. J.**—The People seek to prosecute a licensed physician for a violation of Penal Code section 274 (abortion). (Amended Stats. 1967, ch. 327, § 3.) At issue is the constitutionality of the 1967 Therapeutic Abortion Act. (Health & Saf. Code, §§ 25950-25954.)[1]

California has traditionally authorized abortions in limited circumstances. Under the terms of the 1967 enactment abortions became more readily available where supported by administrative determinations of the existence of particular circumstances. We are thus confronted not with the question whether the state should or must allow abortions but, rather, whether the current legislation satisfies various constitutional tests against which it must be measured. We hold that it does so only in part and dispose of the cause accordingly.

---

[1] Unless otherwise indicated, all citations are to the Health and Safety Code.

Defendant's demurrer to the complaint charging a violation of Penal Code section 274 was sustained by the magistrate. The People appealed from the following order of dismissal, and the appellate department of the superior court reversed and certified the cause for further appellate proceedings. (Code Civ. Proc., § 911. See also Cal. Rules of Court, rule 63(a).) For purposes of our review it has been stipulated that defendant is a licensed physician and surgeon, that the charged abortion was performed during the first trimester (13 weeks) of the woman's pregnancy and that it was not performed in a hospital accredited by the Joint Commission on Accreditation of Hospitals, or in any hospital, as required under current legislation (§ 25951, subd. (a)). We assume that no advance approval of the abortion was made by a committee of a hospital medical staff as no reference thereto was contained in the stipulation.

Penal Code section 274, as amended in 1967, provides: "Every person who provides, supplies, or administers to any woman, or procures any woman to take any medicine, drug, or substance, or uses or employs any instrument or other means whatever with intent thereby to procure the miscarriage of such woman, except as provided in the Therapeutic Abortion Act, Chapter 11 (commencing with Section 25950) of Division 20 of the Health and Safety Code, is punishable by imprisonment in the state prison not less than two nor more than five years."

The Therapeutic Abortion Act authorizes licensed physicians and surgeons to perform abortions in accredited hospitals if the abortion is approved in advance by a committee of the hospital's medical staff, which committee is to be established and maintained in accordance with the standards promulgated by the Joint Commission on Accreditation of Hospitals. (§ 25951.) The committee may never consist of fewer than two licensed physicians and surgeons and a committee of three is required "if the proposed termination of pregnancy will occur after the 13th week. . . ." (§ 25953.) Unanimous consent is required where the committee consists of no more than three members. (§ 25951, subd. (b).) We will consider later a further provision of the statute which states: "In no event shall the termination be approved [by the committee] after the 20th week of pregnancy." (§ 25953.)

Prior to approving an application for an abortion the committee must find that "[t]here is a substantial risk that continuance of the pregnancy would gravely impair the physical or mental health of the mother" (§ 25951, subd. (c)(1)), or that "[t]he pregnancy resulted from rape or incest" (§ 25951, subd. (c)(2)).

326

The term "mental health," which the committee must find will be gravely impaired by continued pregnancy if it approves termination on that ground, is defined as "mental illness to the extent that the woman is dangerous to herself or to the person or property of others or is in need of supervision or restraint." (§ 25954.) It thus appears that rather than defining "mental health" the language purports to define what is deemed to constitute impaired mental health. We will later consider the impact of this language.

Before the committee may approve an application for an abortion for reasons of pregnancy resulting from rape or incest, the application must be submitted to the district attorney for evaluation and a determination of the existence of probable cause to believe that the pregnancy resulted from rape or incest. (Pen. Code, §§ 261, 285.) Procedures for a court review are provided following an adverse determination by the district attorney. (§ 25952.)

Penal Code section 274, in language substantially unchanged between 1850 and 1967, forbade abortions except when necessary to preserve the life of the woman. In 1969, we concluded that the particular language was not susceptible of a clear meaning consistent with legislative intent. (*People* v. *Belous* (1969) 71 Cal.2d 954 [80 Cal.Rptr. 354, 458 P.2d 194].) The current enactment is the result of almost a decade of legislative effort to satisfy sharply conflicting social, religious and other interests.[2] We previously concluded in *Belous* that, in passing the Therapeutic Abortion Act, the Legislature was primarily concerned, not with the protection of the embryo but with the health of the woman involved. (*People* v. *Belous, supra,* 71 Cal.2d 954, 964-966, 971.) We noted there that the decision to have an abortion raises at least two fundamental rights of the woman: the right to life and the right to choose whether to bear children. (71 Cal.2d at p. 963.) In the instant case we are urged to declare that women have a constitutional right to abortions and that this right stems from and is protected from governmental intervention by the right to privacy. Under this theory it is urged that the state may regulate abortions only to promote the health of a woman by requiring that an abortion be performed by physicians in a medically approved manner and by proscribing an abortion only in those rare instances where it would constitute a greater hazard to the woman than bearing the pregnancy to term. The People urge, to the contrary, that such a right to privacy, if it exists at all in this context, is offset by a compelling state interest in protecting

[2]An extensive discussion of the legislative treatment of various proposals for abortion law reform during the years 1961 to 1965 is contained in Sands, *The Therapeutic Abortion Act: An Answer to the Opposition* (1966) 13 U.C.L.A. L. Rev. 285.

fetuses and embryos. We hold, for reasons hereinafter considered, that the Therapeutic Abortion Act may not be enforced to prohibit abortions not falling within the conceded limits of proper state regulation, and for that reason we need not resolve those issues raised by the claimed right of privacy.

Defendant contends that various provisions of the Therapeutic Abortion Act are so ambiguous that they cannot be constitutionally enforced. ■ "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." (*Connally* v. *General Construction Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126]; see also *Cramp* v. *Board of Public Instruction* (1961) 368 U.S. 278, 287 [7 L.Ed.2d 285, 292, 82 S.Ct. 275]; *Bouie* v. *City of Columbia* (1964) 378 U.S. 347, 351-352 [12 L.Ed.2d 894, 898-899, 84 S.Ct. 1697]; *People* v. *McCaughan* (1957) 49 Cal.2d 409, 414 [317 P.2d 974].) Where the requisite certainty is not apparent on the face of the statute the deficiency may be satisfied by "common understanding and practices" (*United States* v. *Petrillo* (1947) 332 U.S. 1, 8 [91 L.Ed. 1877, 1883, 67 S.Ct. 1538]; see *Roth* v. *United States* (1957) 354 U.S. 476, 491 [1 L.Ed.2d 1498, 1511, 77 S.Ct. 1304]) "or from any demonstrably established technical or common law meaning of the language in question" (*In re Newbern* (1960) 53 Cal.2d 786, 792 [3 Cal.Rptr. 364, 350 P.2d 116]). Although it is inevitable that there will be "some matter of degree" involved in most penal statutes (*Nash* v. *United States* (1913) 229 U.S. 373, 377 [57 L.Ed. 1232, 1235, 33 S.Ct. 780]), "stricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect" on fundamental rights (*Smith* v. *California* (1959) 361 U.S. 147, 151 [4 L.Ed.2d 205, 210, 80 S.Ct. 215]; see also *Cramp* v. *Board of Public Instruction, supra,* 368 U.S. 278, 287-288 [7 L.Ed.2d 285, 292-293]).

While the basic standard against which statutes must be measured for vagueness is a constant, the vigor with which that standard is applied varies with the determination whether a constitutionally protected right is involved. We have heretofore concluded that two such rights are raised in the decision to seek an abortion. However, as will be seen, at least two provisions of the Therapeutic Abortion Act are so imprecise that we would be compelled to conclude that they are impermissibly vague even were no areas of constitutional protection involved.

The almost universal ground upon which committee approval of an abortion has been granted is on a finding that there "is substantial risk

that continuance of the pregnancy would gravely impair the physical or mental health of the mother." (§ 25951, subd. (c)(1).) "Risk" means "Hazard; danger; peril; exposure to loss, injury, disadvantage, or destruction. . . ." (Webster's New Internat. Dict. (2d ed. 1948, unabridged).) "Substantial" is defined in part as "not seeming or imaginary; not illusive; real; true . . . considerable in amount, value, or the like . . . firmly established; solidly based . . ." (Webster's New Internat. Dict., *supra*). We have recognized that it is a relative term and that its meaning must be drawn from the circumstances. (*Atchison etc. Ry. Co.* v. *King's Co. Water Dist.* (1956) 47 Cal.2d 140, 144 [302 P.2d 1].) In the instant case we need not resolve defendant's contention that the phrase "substantial risk" is so ambiguous that, standing alone, it suffers constitutional infirmities for vagueness.[3] Even if we deem the phrase to establish a proper measure of the *probability* of impairment, we are nevertheless unable for reasons which follow to ascertain what *degree* of impairment must result from a continuance of pregnancy in order to "gravely impair" a prospective abortee's health. For these reasons the statutory language is void for vagueness.

"Impair" means to "make worse; to diminish in quantity, value, excellence, or strength." "Gravely" means "in a grave or serious manner." (Webster's New Internat. Dict., *supra*.) Certainly a pregnant woman's

---

[3]Qualifying words like "reasonable" or "substantial" may or may not add certainty in particular contexts. (See *People* v. *Belous, supra,* 71 Cal.2d 954, 970.) They make more certain what is particularly proscribed in circumstances where conduct is already criminal in nature. When one is engaged upon a course of conduct which is clearly criminal, the nature of the aggravation by which the law measures the degree of the crime may be defined by such qualifying words. In such instances the wrong-doer cannot be heard to complain on grounds of vagueness as the essential element upon which the void-for-vagueness doctrine rests—the lack of a fair notice of proscribed conduct—is itself lacking. (See Note, *The Void-For-Vagueness Doctrine In the Supreme Court* (1960) 109 U.Pa.L.Rev. 67.) Such is the case of one embarked upon a robbery who may expose himself to a greater penalty if movement of his victim in the accomplishment of the robbery "substantially increased the risk of harm over and above that necessarily present in the crime of robbery itself." (*People* v. *Daniels* (1969) 71 Cal.2d 1119, 1139 [80 Cal. Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677].) On the other hand, and as in the instant case, language which attempts to draw a line separating proscribed conduct from conduct which is either protected or not otherwise proscribed is on dangerous ground when it must depend on qualifying words such as "reasonable" or "substantial" to define the line beyond which proper conduct becomes criminal. In *Belous,* for instance, we contemplated the sufficiency of language which proscribed abortions except where " 'substantially or reasonably' necessary to preserve the life of the mother," and concluded that while the qualifying words in other contexts "may add certainty and avoid other due process objections, in the instant case the implication of such words would merely increase the uncertainty." (71 Cal.2d at p. 970.) Vagueness is predicated in such instance on the lack of fair notice of what is and what is not proscribed in a setting where the conduct is not otherwise criminal.

health would be gravely impaired if death were to result from her pregnancy, and it cannot be denied that there is a significant death rate associated with childbirth.[4] During the early stages of pregnancy, a hospital abortion is four to six times safer for the woman than is bearing the pregnancy to term. (Dept. Public Health, Fourth Annual Rep. on the Implementation of the Cal. Therapeutic Abortion Act (1971) p. 3;[5] see also, *People* v. *Belous, supra,* 71 Cal.2d 954, 965.) Aside from pregnancies resulting in deaths, a normal pregnancy to term with only the normal demands on a woman's body would be deemed by many of common intelligence to seriously worsen her health or "diminish [it] in quantity, value, excellence, or strength." Many individuals would conclude that absent exceptional medical circumstances, continued normal pregnancy to full term imposes such a grave impairment to health that abortion should be available as a matter of routine during at least the first trimester. In *Belous* we suggested that this was a correct interpretation: "Thus, the test established is a medical one, whether the pregnant woman's physical and mental health will be furthered by abortion or by bearing the child to term. . . ." (71 Cal.2d at p. 971.)

It seems more probable, however, that the legislative intent was to require some impairment to health greater or of a different nature than that attendant upon normal pregnancy before the committee could approve an application for an abortion for reasons of risk of impaired health. If so, the standard remains equally obscure. It is almost axiomatic that a woman not desiring to continue a pregnancy is subject for psychological reasons to greater impairment of health than a happy pregnant woman. Is this the requisite increased impairment or is the statute intended to require some further, undefined, mathematical measure of diminished health? It is possible that the Legislature did not intend to refer to a variation from the norm, but rather to some definite probability, again unspecified, of mishap. Whatever the nature of the impairment intended by the Legislature the degree thereof which renders it as grave must be resolved in light of the fact that we are dealing with a woman's health. Persons of common intelligence in significant numbers will agree that the slightest impairment of health is of grave concern while others of like intelligence may demand considerably more. In any event, we are unable

---

[4]In 1969 the preliminary computation of the maternal death rate was 27.4 per 100.000 live births. (Statistical Abstract of the United States (1971) table 73 at p. 55; see also *People* v. *Belous, supra,* 71 Cal.2d 954, 963.)

[5]Unless otherwise indicated, statistics for the year 1970 are from this report as either direct excerpts or as the result of simple computations performed employing such statistical excerpts. Statistics for earlier years are from the Department of Public Health, Third Annual Report on the Implementation of the California Therapeutic Abortion Act (1970).

to ascertain within the meaning of the statute either the nature of the diminished health required or that degree of diminution which stamps it as gravely impaired. ■ We can only conclude that on its face the "gravely impair" requirement is impermissibly vague in its present context.

As we have noted, the continued pregnancy must create a substantial risk of gravely impaired physical or "mental health" before the committee can approve an application for an abortion for medical reasons. The term "mental health," as employed in the context of the statute, is also claimed to create impermissible ambiguities. Its definition as a "mental illness to the extent that the woman is dangerous to herself or to the person or property of others or is in need of supervision or restraint" (§ 25954) appears to be, with only minor modifications, a statement of the former standard for involuntary commitment to a mental institution.[6] We are concerned, however, not with the specific parts of the definition but with the obvious error in defining mental health as its own antithesis: mental illness. When section 25954 is read with the appropriate portions of section 25951, one discovers that abortions may be approved if there is a substantial risk that continuance of the pregnancy would gravely impair the mental illness of the woman to the extent that she is dangerous to herself or to the person or property of others or is in need of supervision or restraint. The clear dictate of this provision is that the woman must already be dangerous or in need of supervision or restraint, and in danger of a further aggravation of her condition. Such a construction, however, is probably not consistent with the legislative intent. It is more likely that the Legislature did not intend to require any preexisting derangement, but the wording of the provision clearly states that it is mental illness, not mental health, which must be worsened. Unquestionably men of both common and uncommon intelligence have been forced to speculate on the meaning of this provision.

Soon after the Therapeutic Abortion Act was adopted, it was suggested that the test committee members must apply was stricter than that for commitment. (Leavy & Charles, *California's New Therapeutic Abortion Act: An Analysis and Guide to Medical and Legal Procedure* (1967) 15 U.C.L.A. L.Rev. 1, 8.) In practice, however, in 1970, 63,872 abortions were approved in California and 61,572 were performed, both figures

---

[6]Prior to the adoption of the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.), Welfare and Institutions Code section 5550 provided: " 'Mentally ill persons' . . . means persons who come within either or both of the following descriptions: (a) Who are of such mental condition that they are in need of supervision, *treatment, care,* or restraint. (b) Who are of such mental condition that they are dangerous to themselves or to the person or property of others, *and are in need of supervision, treatment, care, or restraint. . . .*" (Italics added to demonstrate changes.)

representing 98.2 percent of all approvals and all abortions, for reasons of mental health.[7] Serious doubt must exist that such a considerable number of pregnant women could have been committed to a mental institution. Either pregnancy carries risks to mental health beyond those ever imagined, or legal writers and members of therapeutic abortion committees, two groups we must assume to be of at least common intelligence, have been forced to guess at the meaning of this provision and have reached radically different interpretations.

That the language establishing the permissible medical indications for abortion is vague is further attested to by widespread complaints of uncertainty in the medical profession. (Final Rep. of the Ad Hoc Committee on Therapeutic Abortions of the Cal. Medical Assn. House of Delegates (1970) p. 5.) This report indicates that the medical community is not only uncertain about the proper interpretation of the law but entertains genuine apprehension that it is called upon to make legal determinations beyond medical competence. (Compare *People* v. *Belous, supra,* 71 Cal.2d 954, 971.)

There is further evidence that the Therapeutic Abortion Act has not established meaningful standards for the physicians who must administer it in the wide divergences in ratios of abortions to applications and abortions to live births that have occurred throughout the state.[8] Although

[7]Subsequent to oral argument in this case, the Department of Public Health issued its Fifth Annual Report on the Implementation of the California Therapeutic Abortion Act. We take judicial notice thereof. (Evid. Code, §§ 452, subd. (h), 459.) The number of applications, number of approvals, and the reasons for which abortions are requested, approved, and performed, are no longer provided. The total number of abortions performed climbed to 116,749 in 1971, and the rate rose to 286.7 per 1,000 live births.

[8]

| | 1967 | | 1968 | | 1969 | | 1970 | |
|---|---|---|---|---|---|---|---|---|
| | Abortions per 1000 Live Births | Abortions as % of Applications | Abortions per 1000 Live Births | Abortions as % of Applications | Abortions per 1000 Live Births | Abortions as % of Applications | Abortions per 1000 Live Births | Abortions as % of Applications |
| State | 9.2 | 86.9 | 14.8 | 88.8 | 43.5 | 93.6 | 172 | 95.6 |
| High Region | 26.5 | 100 | 42.7 | 91.7 | 115.4 | 100 | — | 99.3 |
| Low Region | 1.8 | 60 | 2.2 | 81.4 | 2.7 | 89.8 | — | 94.6 |
| L.A. Area | 4.5 | 76.4 | 6.5 | 81.4 | 19.1 | 89.8 | — | 94.9 |
| S.F. Bay Area | 26.5 | 91.3 | 42.7 | 91.3 | 115.4 | 94.6 | — | 96.1 |

In both 1969 and 1970 the San Francisco Bay Area had 22 percent of the state's

complete statistics are not available, those figures compiled in the footnote strongly suggest that during the first years of practice under the act the medical criteria were construed and applied differently in various regions of the state. By 1970 committee members had apparently despaired of comprehending the medical criteria and approved virtually all applications for reasons of mental (99 percent) and physical (98.6 percent) health impairment.[9]

■ We are compelled to conclude that the language establishing the medical criteria upon which abortions may be approved is not sufficiently certain to meet minimal standards of due process. (U.S. Const., Amend. XIV, § 1; Cal. Const., art. I, § 13.)

■ Further, defendant has standing to raise the question of constitutional infirmity although he personally was not charged with applying the vague standards which would have confronted a medical committee had its approval been sought. In *People* v. *Belous, supra,* 71 Cal.2d 954, we noted that under former Penal Code section 274 a physician acted at his peril with each determination to abort a patient. We distinguished responsibility under that section and the Therapeutic Abortion Act, noting that the act "reduces these pressures [upon the physician]. The act specifically authorizes an abortion by a licensed physician . . . where the abortion is approved in advance by a committee. . . . At least in cases where there has been adherence to the procedural requirements of the statute, physicians may not be held criminally responsible, . . ." (71 Cal.2d at pp. 972-973.)

We are not here concerned, of course, with the criminal responsibility of a physician who attempted to comply with the provisions of the act, but rather with the responsibility of a physician who failed to comply on

live births, but 59 percent of the 1969 and 34 percent of the 1970 abortions. The same figures for the Los Angeles area are 44 percent, 19 percent and 44 percent.

[9]The legislative history is of no help in resolving the ambiguities. The Legislature apparently sought to bring the abortion law into close alignment with the medical practices of 1967. In its original form the proposed legislation reflected the sponsors' belief that they were doing so. Several amendments were made, however, at least two of which represented retreats from the prevailing medical standards: addition of the definition of mental health (Note, *The California Therapeutic Abortion Act: An Analysis* (1967) 19 Hastings L.J. 242, 246), and deletion of authorization of an abortion when there was a "substantial risk that the child would be born with a grave physical or mental defect" (Leavy & Charles, *California's New Therapeutic Aborton Act: An Analysis and Guide to Medical and Legal Procedure, supra,* 15 U.C.L.A. L.Rev. 1, 23; Note, *The California Therapeutic Abortion Act: An Analysis, supra,* 19 Hastings L.J. 242, 249). The result is that we are not able to turn to the medical standards of 1967 as an aid in determining the meaning of the particular provisions which have disturbed us.

the ground that the act, insofar as committee approval for an abortion is concerned, is void and a nullity. If the defendant as a physician has no personal interest in challenging the statute on grounds that it fails fairly to advise of conduct in which he may not engage, a patient seeking an abortion by him certainly has an interest in asserting that the statute fails fairly to advise her of its prohibitions. A woman submitting to an abortion other than as provided in the Therapeutic Abortion Act is herself guilty of a felony. (Pen. Code, § 275.) It is no answer to say that committee approval is the touchstone. Committee approval is intended only to reflect the satisfaction of the statutory requirements. (See *Ballard* v. *Anderson* (1971) 4 Cal.3d 873, 884-885 [95 Cal.Rptr. 1, 484 P.2d 1345, 42 A.L.R.3d 1392].) Those requirements must be comprehensible both to the prospective patient and to those charged with the decision whether an abortion may be performed. Where, as here, even the latter are unable to comprehend the import of the standards, the woman clearly may complain of the act. ▮ A physician has standing to assert his patient's rights where they may not otherwise be established. (*Griswold* v. *Connecticut* (1965) 381 U.S. 479, 481 [14 L.Ed.2d 510, 512, 85 S.Ct. 1678]; *Ballard* v. *Anderson, supra,* 4 Cal.3d 873, 877-878.)

▮ We recognized in *Belous* the applicability of that rule when asserted in defense to a criminal charge, noting that the defendant physician's standing to raise his patient's rights upon which her entitlement to an abortion was claimed was "unchallenged." (71 Cal.2d at p. 963, fn. 5.) The rule is equally applicable in the instant case.

Having concluded that the language establishing the medical criteria for approval of abortions is impermissibly vague, we are further compelled either to hold the whole of the Therapeutic Abortion Act invalid or to preserve it in part after excising the invalid portions. ▮ "The test of severability is whether the invalid parts of the statute can be severed from the otherwise valid parts without destroying the statutory scheme, or the utility of the remaining provisions. [Citations.]" (*Blumenthal* v. *Board of Medical Examiners* (1962) 57 Cal.2d 228, 238 [18 Cal.Rptr. 501, 368 P.2d 101]; *Dillon* v. *Municipal Court* (1971) 4 Cal.3d 860, 872 [94 Cal.Rptr. 777, 484 P.2d 945].) The manifest principal legislative intent embodied in the Therapeutic Abortion Act was to provide for abortions under an array of circumstances when they afford an appropriate medical remedy. To invalidate the whole of the act or to preserve it and invalidate only section 25951, subdivision (c)(1), and authorize abortions only when the pregnancy resulted from rape or incest, would clearly thwart that fundamental purpose. The latter course, for instance, would proscribe abortions "where death from childbirth although not medically

certain, would be substantially certain or more likely than not," a standard we held to be constitutionally impermissible in *Belous.* (71 Cal.2d at p. 969.) We can only conclude that under the prevailing statute, abortions are available without the necessity of satisfying the criteria purported to be established under section 25951, subdivision (c). As a practical matter, there is little doubt that the act is now being administered in such a fashion.

■ Those provisions of the Therapeutic Abortion Act establishing the medical committees and their procedures and directing involvement of the district attorneys and courts in cases raising issues of rape and incest have no function independent of the criteria we have held to be invalid. (Cf. *Ballard* v. *Anderson, supra,* 4 Cal.3d 873, 884-885.) Without valid criteria for approval, the statutory scheme requiring a mechanism for such approval is destroyed and the procedures lose their viability. (See *Dillon* v. *Municipal Court, supra,* 4 Cal.3d 860, 872; *Blumenthal* v. *Board of Medical Examiners, supra,* 57 Cal.2d 228, 238.) Thus these portions of the statute must also be held invalid.

■ Remaining are provisions proscribing the performance of abortions after the 20th week of a pregnancy and requiring that abortions be performed by licensed physicians and surgeons and in hospitals accredited by the Joint Commission on Accreditation of Hospitals. These provisions are distinct from the invalid approval standards and mechanism, bear no necessary relationship thereto and are severable therefrom. (See *In re King* (1970) 3 Cal.3d 226, 237 [90 Cal.Rptr. 15, 474 P.2d 983]; cf. *Danskin* v. *San Diego Unified School Dist.* (1946) 28 Cal.2d 536, 555 [171 P.2d 885].) We turn now to an evaluation of such provisions.

As we have noted, section 25953 provides in part: "In no event shall the termination be approved after the 20th week of pregnancy." The bare language of the statute leaves unclear whether the approval must be obtained within the first 20 weeks or whether the abortion must be performed within that time period. The first suggested interpretation is more strongly suggested. ■ "It is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend. [Citations.]" (*Bruce* v. *Gregory* (1967) 65 Cal.2d 666, 673-674 [56 Cal. Rptr. 265, 423 P.2d 193]; see also *In re Haines* (1925) 195 Cal. 605, 613 [234 P. 883].) It is absurd to suppose that the Legislature intended to allow the performance of an abortion at any time during the course of a pregnancy as long as the woman and the doctor had the foresight to get a precautionary approval during the first 20 weeks. ■ We have no

doubt that the legislative intent was to require abortions to be performed within 20 weeks of the time of conception. We find further support for this analysis from the evidence before the Legislature that after 20 weeks there is a possibility that the fetus is viable and that an attempt to induce a premature delivery is a possible alternative to abortion when termination of pregnancy is a necessary medical course. (See Leavy & Charles, *California's New Therapeutic Abortion Act: An Analysis and Guide to Medical and Legal Procedure, supra,* 15 U.C.L.A. L.Rev. 1, 11-12.)

 Although we have refrained from determining whether the Legislature may establish any criteria limiting the decision to terminate a pregnancy during its earlier stages, we think it unquestionable that such power exists, though nothing mandates its exercise, when the fetus is capable of life independent of the body of the woman. California law appears to be unique in establishing the 20th week as the time for a changed legal relationship, but the present record in no way undermines the legislative determination that 20 weeks is an appropriate time for such a change.

The statutory scheme constitutes a complete and absolute proscription on abortions after the 20th week of a pregnancy. No provision is made for medical emergencies, however dire. In *People* v. *Belous, supra,* 71 Cal.2d 954, 969, we noted: "[T]he law has always recognized that the pregnant woman's right to life takes precedence over any interest the state may have in the unborn. . . . [I]t is clear that the state could not forbid a woman to procure an abortion where, to a medical certainty, the result of childbirth would be death. We are also satisfied that the state may not require that degree of risk . . . which would prohibit an abortion, where death from childbirth although not medically certain, would be substantially certain or more likely than not." In the instant case we are presented with a first trimester abortion and a record devoid of evidence that might suggest that the legislative determination was constitutionally impermissible. The validity of the 20-week limitation is not at issue.

 The requirements that abortions be performed only by licensed physicians and surgeons in hospitals accredited by the Joint Commission on the Accreditation of Hospitals are clearly directed to the quality of medical care. Defendant, himself a licensed physician, concedes that this is a valid basis for state regulation and specifically concedes the validity of requiring abortions to be performed by licensed physicians and surgeons. Such requirement is consistent with the policy of excluding unlicensed persons from the practice of the medical arts. (See Bus. & Prof. Code, §§ 2141, 2141.5.)

It would be superfluous to review again those circumstances which demonstrate the high rate of infection and mortality associated with "criminal" or "illegal" abortions. (See *People* v. *Belous, supra,* 71 Cal.2d 954, 965-966.) For practical purposes, illegal abortions have been synonymous with nonhospital abortions. Evidence unequivocally points to the risks associated with the performance of abortions in other than a proper surgical environment and supports the requirement that abortions be performed in hospitals.

We are not unmindful that recent experience in the State of New York has indicated that abortions may be performed in clinics with safety comparable to that in hospitals. (Tietze & Lewit, Legal Abortions: Early Medical Complications (Oct. 1971) 3 Family Planning Perspectives, No. 4, p. 6.)[10] This falls far short, however, of providing any constitutional basis for challenging the legislative determination that, consistent with the general welfare, abortions may be performed only in accredited hospitals.

Defendant also challenges the accreditation requirements by which only particular hospitals are designated for the performance of abortions. Although all hospitals in California must be licensed by the State Department of Public Health (§ 1400), the additional requirement has been imposed that hospitals in which abortions are performed be accredited by the Joint Commission on Accreditation of Hospitals. It is urged that this requirement is both an improper delegation of power to a private body and overbroad.

The Joint Commission on Accreditation of Hospitals is a private group, headquartered in Illinois. Both the federal and state governments have relied upon the standards of the Joint Commission as a guarantee of high quality medical care.[11] (See, 42 U.S.C. §§ 1395x(e)(8), 1395bb (Medi-

[10]Although the Therapeutic Abortion Act does not allow the performance of abortions in nonhospital clinics, it clearly allows the handling of abortions on an outpatient basis. We note that these, too, appear to be as safe as inpatient abortions. (Margolis & Overstreet, Legal Abortion Without Hospitalization (1970) 36 Obstetrics & Gynecology 479; Goldsmith & Margolis, Aspiration Abortion Without Cervical Dilation (1971) 110 Am. J. Obstetrics & Gynecology 580.)

[11]We have, on the record before us, only an October 1969 edition of the standards of the Joint Commission. That document establishes the principal functions of the organzation as being:

"1. To establish standards for the operation of hospitals and other health care facilities and services.

"2. To conduct survey and accreditation programs that will encourage members of the health professions, hospitals and other health care facilities and services voluntarily to a. apply certain basic principles of physical plant safety and maintenance, and of organization and administration of function for efficient care of the patient;

care); 22 Cal. Admin. Code, § 51207 (a)(3) (Medi-Cal).) Such reliance upon the standards of professional accrediting bodies is not an unconstitutional' delegation of governmental power if it is neither arbitrary, unreasonable, nor discriminatory. (See, e.g., *Colorado Polytechnic College* v. *State Board for Community Colleges and Occupational Education* (1970) 173 Colo. 39 [476 P.2d 38]; *Green* v. *City of St. Petersburg* (1944) 154 Fla. 339 [17 So.2d 517]; cf. *Marjorie Webster Jr. Col.* v. *Middle States Ass'n of C. & S.S.* (1970) 432 F.2d 650, 655-656 [139 App.D.C. 217]; *Wallington* v. *Zinn* (1961) 146 W.Va. 147 [118 S.E.2d 526].) Thus, in reality, the considerations bearing upon the propriety of the delegation are substantially similar to those bearing on overbreadth.

We are not aware that the standards of the Joint Commission are specifically related to the existence of facilities relevant to the performance of abortions.[12] We have noted above, however, the high regard in which accreditation is held as a guarantee of the quality of medical care. Existent state practices for licensing hospitals are essentially concerned with the grosser aspects of construction and facilities. (§§ 1400-1426.) The risk of loss of accreditation is an effective guarantee that a hospital will not allow its facilities for the performance of abortions to deteriorate. Further, in a manner virtually unduplicatable by state regulation, the standards of the Joint Commission encourage the best medical practice by providing for ongoing medical review of the qualifications of staff members and of the care given patients. In short, the utilization of these privately developed standards of excellence seems neither arbitrary nor unreasonable.

It is alleged that utilization of the Joint Commission's standards works economic and geographical discriminations. Some counties in the state are apparently without accredited hospitals, in other counties even the county hospital is not accredited, and, it is claimed, individuals are unable to ar-

---

b. promote high quality of care in all aspects in order to give patients the optimum benefits that medical science has to offer; and c. maintain the essential services in the facilities through coordinated effort of the organized staffs and the governing bodies of the facilities." (Joint Commission on Accreditation of Hospitals, Standards for Accreditation of Hospitals plus Provisional Interpretations (Oct. 1969) III.)

We are not aware that the commission has promulgated standards governing the establishment and maintenance of therapeutic abortion committees as contemplated by section 25951, subdivision (b).

[12]To be eligible for a survey leading to accreditation an applicant must be a state-licensed hospital, a member of or eligible for associate membership in the American Hospital Association, have been in operation for 12 months, meet certain structural and organizational requirements, have certain support services and at least one of the following clinical services: Medicine; Neurology-Psychiatry; Obstetrics-Gynecology; Pediatrics; Surgery. (Joint Commission on Accreditation of Hospitals, Standards for Accreditation of Hospitals plus Provisional Interpretations, *supra,* p. 109.)

range for abortions solely because of their economic situation. The record fails to establish that the requirement that hospitals be accredited has prevented any woman from securing an abortion for either geographic or economic reasons. Indeed, we note that by 1970 more than one-third of all abortions were paid for by Medi-Cal.

Abortion is the only medical procedure required by criminal sanctions to be performed in a hospital. Other procedures, including those far more dangerous to the patient, may be performed elsewhere. In practice, medical standards require that such operations be performed in hospitals, though possibly not accredited ones. A state seeking to alleviate a social problem need not choose between attacking every aspect thereof and not attacking it at all. (*Dandridge* v. *Williams* (1970) 397 U.S. 471 [25 L.Ed.2d 491, 90 S.Ct. 1153].) As evident herein there has been a long history of abortions performed in inadequate medical surroundings with consequent health risks.[13] ▆▆ Thus historically there is abundant justification for the legislative selection of this particular area as requiring greater qualitative controls than in the case of other medical procedures.

A number of additional contentions have been raised, but they either have been rendered moot by the foregoing, are utterly without merit, or are not shown to be applicable.

▆▆ We conclude that Penal Code section 274 is valid in its entirety. We perceive no constitutional impediments to Health and Safety Code section 25950, to those portions of section 25951 that require abortions to be performed by holders of physician's and surgeon's certificates in hospitals accrediated by the Joint Commission on Accreditation of Hospitals, and to that portion of section 25953 limiting the performance of abortions to the first 20 weeks of pregnancies. ▆▆ Sections 25952 and 25954 are invalid, as are subdivisions (b) and (c) of section 25951 and the first sentence of section 25953.

▆▆ The complaint filed in the municipal court sufficiently alleges that the charged abortion was not performed in a hospital accredited by the Joint Commission on Accreditation of Hospitals and thus does allege the commission of a public offense. However, due process requirements preclude a determination in the instant case that defendant be convicted of a violation of Penal Code section 274 because of his failure to comply with the Therapeutic Abortion Act. Our conclusion that some of the important portions of the act are and were at the time of the alleged violation

---

[13]We may only conjecture upon the effect of legislative limitations on the availability of abortions as one of the factors leading to the seeking or acceptance of substandard care.

invalid, rendered it virtually impossible for defendant to comply with the act at the time he performed the abortion. It is now apparent that defendant, a licensed physician, was not required to obtain approval for the abortion from the medical committee at any hospital. However, unless a medical committee at a particular hospital could anticipate our decision herein and recognize that its approval was not necessary to the performance of an abortion at the hospital, defendant could not use the facilities of an accredited hospital. The statute as enacted by the Legislature and until as herein construed by this court gave no adequate notice to defendant of the prohibited conduct or of procedures constituting compliance therewith, and he cannot be properly charged with its violation. The judgment of dismissal, accordingly, should not be disturbed.

The judgment is affirmed.

Peters, J., Tobriner, J., and Mosk, J., concurred.

**BURKE, J.,** Concurring and Dissenting.—The problem of abortion is one which has deeply troubled our nation's legislators and courts. It commands the most painstaking consideration of the interests of all involved—the woman who desires an abortion, the physician who would perform it, the hospital whose facilities would be used, and lastly and of grave importance, the rights of the embryo or fetus itself, viewed by some simply as an appendage of the mother to be removed at will, and by others as a defenseless child with its own rights to protection and life. Inevitably intertwined into the problem are differing, often widely divergent, social, religious, moral and medical attitudes. It is the solemn responsibility of the Legislature to balance and accommodate these various conflicting and competing interests, a task which it accomplished in 1967 with the passage of the Therapeutic Abortion Act. It is the task of the courts to acknowledge and respect this legislative balancing process and to uphold, if at all possible within constitutional limits, the legislative expression of that process.

The period of debate is over, our personal views, probably as divergent as those of the public generally, are set aside. We address ourselves exclusively to the particular legislation before us, and seek to determine its validity solely by reference to those established legal principles available to courts in determining challenges to legislation on grounds of unconstitutionality.

The Therapeutic Abortion Act is the product of *seven years* of legislative study.[1] Innumerable lengthy hearings were conducted to afford the public

---

[1]Leavy and Charles, *California's New Therapeutic Abortion Act: An Analysis and Guide to Medical and Legal Procedure,* 15 U.C.L.A L.Rev. 1.

ample opportunity to express its views; representatives from numerous diverse groups addressed the Legislature and made known their respective opinions, allegiances and advice. Countless drafts of proposed legislation were prepared, debated and discarded.[2] This lengthy process of hearings, drafting and debate finally culminated in 1967 with the adoption of the Therapeutic Abortion Act, admittedly compromise legislation designed to accommodate as far as possible the opposing interests. The majority herein nullify the Legislature's seven-year effort by means of a type of constitutional attack which, as I will demonstrate, is not even applicable to this case. I repeat "nullify," for the majority have removed from the abortion procedure the most important protective devices designed to deny a right of abortion simply upon the demand of the mother, a concept flatly rejected by the Legislature.

It is a cardinal principle of law, and one which, I respectfully submit, the majority has failed to apply here, that a statute is presumed to be constitutional unless its unconstitutionality clearly and unmistakably appears; all intendments favor its validity and mere doubt is not a sufficient reason to declare it invalid. (*In re Ricky H.,* 2 Cal.3d 513, 519 [86 Cal. Rptr. 76, 468 P.2d 204]; *In re Dennis M.,* 70 Cal.2d 444, 453 [75 Cal. Rptr. 1, 450 P.2d 296].) The majority invalidate the central provisions of the Therapeutic Abortion Act on the basis of their own doubts that the act's provisions are sufficiently certain to comply with due process requirements. However, in striking down the heart of the act, the majority have misapplied the so-called "void for vagueness" rule, have misunderstood the proper limits of that rule, and have misconstrued the evident legislative intent underlying the act's provisions. I now discuss these separate and distinct errors in the majority's analysis of this case.

1. *Health and Safety Code sections 25951 and 25954 are not void for vagueness*

a. *Section 25951*

The pertinent language of subdivision (c) of section 25951, which was adopted from identical language in section 230.3 of the Model Penal Code, requires a finding by the hospital's medical committee that "[t]here is substantial risk that continuance of the pregnancy would gravely impair the physical or mental health of the mother." Although the majority claim that they need not resolve the question, they strongly suggest (*ante,* pp. 327, 328, and fn. 3) that the phrase "substantial risk" is improperly

[2]See Sands, *The Therapeutic Abortion Act: An Answer to the Opposition,* 13 U.C.L.A. L.Rev. 285.

uncertain. Further, they also conclude that the words "gravely impair" are impermissibly vague, furnishing an inadequate standard to guide those who must interpret and follow the act's provisions. To the contrary, this court in *People* v. *Belous,* 71 Cal.2d 954 [80 Cal.Rptr. 354, 458 P.2d 194], has already acknowledged the validity of the act's provisions in this regard: "The further criteria for determining whether an abortion is permissible is the pregnant woman's physical and mental health. Thus, *the test established is a medical one,* whether the pregnant woman's physical and mental health will be furthered by abortion or by bearing the child to term, *and the assessment does not involve considerations beyond medical competence.*" (Italics added; 71 Cal.2d at p. 971.)

The majority herein evidently believe, contrary to the court's prior determination in *People* v. *Belous, supra,* 71 Cal.2d 954, that the medical staff committee of an accredited hospital will,be incompetent to determine what a "substantial" risk is. Yet this court has recently adopted a test in kidnaping cases which requires a determination which is quite similar. In *People* v. *Daniels,* 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677], a case filed one month after the *Belous* decision, we held that in determining whether particular movements of the robbery victim constituted the crime of kidnaping, the test is whether or not the movements "are merely incidental to the commission of the robbery and do not *substantially increase the risk of harm* over and above that necessarily present in the crime of robbery itself." (71 Cal.2d at p. 1139; italics added.) As stated in a subsequent case, *People* v. *Timmons,* 4 Cal.3d 411, 415 [93 Cal.Rptr. 736, 482 P.2d 648], "The true test in each case is not mere mileage but whether the movements of the victims '*substantially* increase the risk of harm' . . . . [T]he qualifier ["substantially"] is significant." In *Timmons* the court recognized that the word "substantially" is a relative one, requiring the exercise of judgment, and that the substantiality of a risk of harm will vary from case to case depending upon the particular circumstances. (4 Cal.3d at p. 416, fn. 2.)

If the "substantial risk" language of the Therapeutic Abortion Act is impermissibly vague, then certainly the same language in our own·redefinition of kidnaping should be held too vague to serve as a basis for the imposition of the drastic penalties which accompany that crime. Yet, as we made clear in *People* v. *Daniels, supra,* 71 Cal.2d 1119, "The law is replete with instances in which a person must, at his peril, govern his conduct by such nonmathematical standards as 'reasonable,' 'prudent,' 'necessary and proper,' '*substantial*,' and the like. . . . Yet standards of this kind are not impermissibly vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind."

(Italics added; 71 Cal.2d at pp. 1128-1129; see also *People* v. *Victor,* 62 Cal.2d 280, 298-300 [42 Cal.Rptr. 199, 398 P.2d 391].)[3]

If the "substantial risk" and "gravely impair" language of Health and Safety Code section 25951 were truly uncertain, and subject to widely conflicting interpretations from hospital to hospital, we would expect the statistics to disclose such a variation. Yet the majority's own figures demonstrate that by 1970 the approval rate was relatively uniform throughout the state. (*Ante* at p. 331.) The variations in earlier years may be explained by a probable initial reluctance on the part of hospitals in certain areas of the state to sanction a practice which, prior to 1967, was not only a felony under the law but also ran counter to fundamental medical responsibility to protect and preserve the life of the fetus, except for the gravest of reasons (such as the preservation of the life of the mother herself).

Giving the language of Health and Safety Code section 25951 a reasonable, common sense construction, the words "substantial risk that continuance of the pregnancy would gravely impair the physical or mental health of the mother," may be interpreted as requiring an actual (not imaginary, remote or conjectural), medically cognizable risk of serious harm over and above the risk ordinarily associated with childbirth. In the words of the majority, "It seems . . . probable . . . that the legislative intent was to require some impairment to health greater or of a different nature than that attendant upon normal pregnancy before the committee could approve an application for an abortion for reasons of risk of impaired health." (*Ante* at p. 329.) Otherwise, an abortion would be permitted in every case, and the Therapeutic Abortion Act's provisions rendered superfluous. Presumably, the determination required under section 25951 would be no different than the routine analysis which every physician must make in deciding whether or not a particular risk justifies a contemplated operative procedure. Of necessity, the language is sufficiently broad to enable the medical staff committee to exercise an amount of discretion in each case.

---

[3]The majority (*ante,* pp. 327, 328, fn. 3) would distinguish *Daniels* on the basis that the "substantial risk" language in the Therapeutic Abortion Act defines "the line beyond which proper conduct becomes criminal," and thus fails to give "fair notice" as to which abortions are criminal and which are not. The majority have misread the act. As I explain in part 2 hereof, the "substantial risk" criterion is solely for the guidance of the hospital's medical committee in determining whether or not to approve an abortion. Neither the mother nor her doctor is required to guess at the meaning of the term "substantial risk" at the peril of violating the act. So long as the requisite approval is obtained from the committee, neither the mother nor her doctor may be prosecuted. Conversely, if no such advance approval is obtained, the abortion is illegal even though it may be belatedly contended that a substantial risk did exist.

The majority apparently believe the statutory language is too broad to serve as a useful standard; they find it "almost axiomatic" that every woman seeking an abortion is subject to some psychological risks. It is also true, however, that the performance of a successful abortion in itself may result in adverse psychological effects. Thus, that psychological risks may exist in every case does not necessarily indicate that an abortion must be approved in every case. It is the committee's responsibility under the act to determine whether, *in a particular case,* the usual psychological pressures constitute a substantial risk of impaired mental or physical health, or, for example, whether, under the circumstances of that case, the mother's "physical and mental health will be furthered . . . by bearing the child to term . . . ." (71 Cal.2d at p. 971.)

### b. *Section 25954*

Thus, we approach the majority's alternative vagueness theory, namely, that the Legislature defined "mental health" as "mental illness." The majority in discussing a different part of the Therapeutic Abortion Act recognize that " 'It is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend. [Citations.]' " (*Ante* at p. 334.) Yet the majority overlook the evident application of that principle to the "mental health" definition in the act. The majority's premise is that the term "mental health" in subdivision (c) of Health and Safety Code section 25951 is defined as "mental illness" in section 25954, thereby resulting in the absurd consequence that an abortion may be approved only if there is a substantial risk that continuance of the pregnancy would gravely impair the mother's mental illness. The majority conclude "[t]he clear dictate of this provision is that the woman must already be dangerous or in need of supervision or restraint, and in danger of a further aggravation of her condition." (*Ante* at p. 330.)

The majority concede, however, as they must, that "[i]t is more likely that the Legislature did not intend to require any preexisting derangement . . . ." (*Ante* at p. 330.) Indeed, earlier in their opinion, the majority state "[i]t thus appears that rather than defining 'mental health' the language [of section 25954] purports to define what is deemed to constitute *impaired* mental health." (Italics added; *ante* at p. 326.) Quite obviously, this is precisely what the Legislature intended to do. There is nothing in the Therapeutic Abortion Act, or in prior drafts thereof, suggesting that therapeutic abortions should be available only to mentally ill mothers. The entire thrust of the act is to *prevent* mental and physical illness which threatens to arise from continued pregnancy. The evident purpose of

Health and Safety Code section 25954 was, as the majority themselves acknowledge, to define more precisely the type of risk which would justify an abortion, namely, the risk that the woman might become, through continued·pregnancy, dangerous to herself or others or in need of supervision or restraint.

As stated in one of the articles cited by the majority, "In one sense, this qualifying section [25954] may just restate the grounds for a mental health abortion, i.e., that there be a substantial risk of grave impairment of mental health. It may have been the legislature's way of saying 'and we really mean it.' . . . [I]t is incumbent on the doctors to recognize that the Legislature intended to restrict abortions for mental health to serious cases." (Leavy and Charles, *supra,* 15 U.C.L.A. L.Rev. 1, 8.)

I would conclude that the language of sections 25951, subdivision (c), and 25954 of the Health and Safety Code is not unconstitutionally vague since, as the court previously stated in *People* v. *Belous, supra,* 71 Cal.2d 954, the test established "is a medical one [which] . . . does not involve considerations beyond medical competence."

### 2. The "void for vagueness" rule is inapplicable

The majority's *sole* ground for invalidating the act's provisions regarding the requisite committee finding of substantial risk is that those provisions are impermissibly vague and uncertain, and that it would be a denial of due process to impose criminal penalties under such circumstances. Even if we assume contrary to the foregoing analysis, that the act's "substantial risk" provision is vague and uncertain, I strongly dispute the majority's conclusion that any such uncertainty violates due process in this case.

The majority rely upon a line of cases which hold that " '[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' " (*Ante* at p. 327.) These cases have as their premise the accepted principle that " ' "No one may be required *at peril of life, liberty or property* to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids . . . ." ' " (Italics added; *People* v. *Belous, supra,* 71 Cal.2d 954, 960, quoting from an earlier case.)

In *People* v. *Belous, supra,* 71 Cal.2d 954, for example, the majority invalidated as unconstitutionally vague former Penal Code section 274, which made it a crime to commit an abortion "unless the same is necessary to preserve [the woman's] life . . . ." The court deemed the quoted

language too uncertain to justify the imposition of criminal penalties, stating that "the physician acts at his peril if he determines that the woman is entitled to an abortion. He is subject to prosecution for a felony and to deprivation of his right to practice medicine . . . if his decision is wrong." (71 Cal.2d at p. 972.) The court in *Belous* distinguished the responsibility of the physician under the requirements of Penal Code section 274 from those under the Therapeutic Abortion Act which, the court noted, "reduces these pressures [upon the physician]. The act specifically authorizes an abortion by a licensed physician in an accredited hospital where the abortion is approved in advance by a committee of the medical staff of the hospital, applying medical standards. (Health & Saf. Code, § 25951.) At least in cases where there has been adherence to the procedural requirements of the statute, *physicians may not be held criminally responsible, and a jury may not subsequently determine that the abortion was not authorized by statute."* (Italics added; 71 Cal.2d at p. 973.)

In other words, unlike the statute attacked in *People* v. *Belous, supra,* 71 Cal.2d 954, the Therapeutic Abortion Act does not require the physician to act at his peril and speculate whether he may or may not legally perform an abortion. Instead, he may use whatever standard he, in his professional judgment, may choose in determining whether an abortion should be performed. Thereupon, as *Belous* points out, all the physician must do under the act is follow the *procedural* requirements specified in section 25951, namely, obtain advance approval from the hospital's medical staff committee and a finding *by that committee* that either the requisite substantial risk exists or that the pregnancy resulted from rape or incest. So long as the committee makes the requisite finding and approves the abortion, the physician may perform it in an accredited hospital without fear of criminal prosecution.

To hold, as the majority do, that defendant Barksdale was denied due process by being compelled to guess at what the act required of *him* is simply bewildering to me. The *only* persons who are required to interpret and apply the "substantial risk" language are those persons who comprise the medical staff committee of the hospital, and neither the act nor Penal Code section 274 imposes criminal liability for the committee's possible error in appraising the substantiality of the risk to the mother in a particular situation.

The majority attempt to circumvent the foregoing analysis by arguing that Doctor Barksdale had standing to assert his patient's own right to fair notice of the act's requirements. The majority note that the woman who submits to an illegal abortion is herself guilty of a felony. (Pen. Code,

§ 275.) Yet the vagueness theory no more applies to the woman who seeks an abortion than to the doctor who seeks to perform it: Both are unequivocally advised by the act's provisions that they must obtain advance committee approval, accompanied by the committee's finding of the requisite substantial risk, before an abortion may legally be performed. Thus, neither the doctor nor his patient is required to guess at the meaning of the act's provisions at the peril of committing a felony. If they obtain the requisite committee finding and approval, they are insulated from criminal sanction; if they fail to obtain that finding and approval, they will commit a felony if they carry on with the abortion. Thus, any possible uncertainty in the minds of the members of the hospital's medical committee regarding the act's requirements could not affect or expand the criminal responsibility of the doctor or his patient.

I concur, of course, with the majority's decision herein to the extent that it upholds those provisions of the act which prohibit abortions from being performed in unaccredited hospitals or by persons who do not hold physician's and surgeon's certificates. By depriving the act, however, of its carefully considered protective devices the majority adopt for this state a policy of abortion at the will of the mother, a concept expressly rejected by the Legislature. I would uphold the act in its entirety.

The order of dismissal should be reversed.

McComb, J., and Sullivan, J., concurred.

Appellant's petition for a rehearing was denied December 29, 1972. McComb, J., Burke, J., and Sullivan, J., were of the opinion that the petition should be granted.