10 Cal.3d 799 (1974)
518 P.2d 1151
112 Cal. Rptr. 199
Estate of SUSAN L. NUNN, Deceased.
HOUSTON L. FLOURNOY, as State Controller, Petitioner and Appellant,
v.
BEVERLY HILLS NATIONAL BANK, as Executor, etc., Objector and Respondent.
Docket No. L.A. 30109.
Supreme Court of California. In Bank.
February 20, 1974.
*802 COUNSEL
Myron Siedorf, Walter H. Miller and Edwin Rosenthal for Petitioner and Appellant.
Jones & Bednar, William E. Burby and Philip C. Jones for Objector and Respondent.
OPINION
WRIGHT, C.J.
The Controller of the State of California appeals from an order fixing the inheritance tax in the matter of the estate of Susan L. *803 Nunn, deceased.[1] The basic question presented is whether Susan at the time of her death possessed a general power of appointment over the assets of a testamentary trust provided for by her predeceased husband, George Lee Nunn. We conclude that she possessed such a power and that the inheritance tax appraiser properly included the assets of the trust in Susan's estate.[2] Accordingly, we reverse the order determining no part of the trust assets were taxable in her estate.
On April 24, 1952, George Lee Nunn and Susan L. Nunn executed a joint and mutual will. Insofar as is here relevant the will provided that all their property, with certain exceptions, was community property. Each bequeathed the survivor a life estate in his or her net estate with the power to invade the corpus for the life tenant's "use and need" as the life tenant "may determine." Subject to the life estate and power to invade, each made bequests of the uninvaded corpus to identical remaindermen. The bequests of the life estates and powers to invade were made in lieu of any and all community property and other claims of interest which the survivor might have asserted in or against the estate of the other.[3]
*804 The mutual will further provided in paragraph Twelfth: "GEORGE LEE NUNN and SUSAN LINTHICUM NUNN hereby jointly and mutually agree with each other, in consideration of our respective promises and of our reciprocal devises and bequests herein contained, that this Will shall not be revoked, changed or amended by us without the written consent of the other, and they further agree that after the demise of one of the parties hereto, the survivor shall not in any event revoke, change or amend this Will. They each further agree that the survivor will seriously endeavor to use only the income from the combined estates of husband and wife for the support, maintenance, care and comfort of said survivor, including a comfortable dwelling, good food and raiment, health and/or hospital service, travel and congenial diversions. This is not intended however to limit the right to invade the corpus given to said survivor as a part of his or her life estate, and pursuant to such right the survivor shall have the right to use all of any part of the corpus for the purposes hereinabove stated should circumstances develop which, in the discretion of said survivor, should require or justify such use of corpus." (Italics added.)
George died on August 9, 1959, and the will was admitted to probate. His entire net estate was distributed pursuant to a decree of distribution to the Beverly Hills National Bank and Trust Company as trustee, with the net income to be distributed periodically to Susan for her life, subject to the following provision: "Any net income of the Trust Estate which SUSAN L. NUNN shall not require, need or want which in her judgment she shall deem to be in excess of that necessary for her support, maintenance, care, comfort, the providing of a comfortable dwelling, good food and raiment, health or hospital service, travel and congenial diversions shall be accumulated by the Trustee and ... reinvested in sound corporate stocks...."
The decree additionally provided: "SUSAN L. NUNN shall have and is hereby given the right during her natural life to invade the corpus of the Trust Estate for her own use and need as she may determine." (Italics added.) The trustee was authorized in the following language to make still other payments from principal:
"If at any time in the absolute discretion of the Trustee SUSAN L. NUNN should because of disability be in need of funds for her proper care, maintenance and support, the Trustee may in its absolute discretion pay to or apply for the benefit of SUSAN L. NUNN in addition to the payments hereinabove provided for her such amounts from the principal of the Trust Estate up to the whole thereof as the Trustee may from time to time deem necessary or advisable for her use and benefit." (Italics added.)
The trial court in the instant proceedings found that Susan had received *805 only income disbursements from the trust and that the consideration given by her for the life interest which she retained in the property subject to the trust "was greater in value than such life interest." It concluded that she held only a life estate with a limited power of appointment, that the named remaindermen held vested interests, and that because the contract embodied in the joint and mutual will became binding on her upon admission of the will to probate, no part of the trust assets were taxable in her estate.
The Controller argues that Susan's power of appointment was a general power taxable upon her death under Revenue and Taxation Code section 13696.[4] We perceive no disagreement that Susan's interest was a life estate coupled with some type of a power of appointment. (1a) The initial question is whether the "use and need" standard for invasion established by the decree of distribution (see Estate of Callnon (1969) 70 Cal.2d 150, 156 [74 Cal. Rptr. 250, 449 P.2d 186]) is "an ascertainable standard relating to ... health, education, support, or maintenance...." (§ 13692, subd. (a).) If so, Susan was vested with only a limited power of appointment.
The current and controlling portion of the Revenue and Taxation Code concerning powers of appointment (div. 2, pt. 8, ch. 4, art. 5; § 13691 et seq.) was adopted in 1965. (Stats. 1965, ch. 1070, § 6, pp. 2716-2719.) The language as adopted is substantially identical to that of federal estate tax provisions dealing with powers. (Int. Rev. Code of 1954, § 2041, 26 U.S.C. § 2041, 68A Stat. 385-387.)[5] (2) The manifest purpose of the 1965 revision was to conform state inheritance tax treatment of powers with *806 the federal estate tax treatment and, consequently, we accord great weight to applicable federal administrative regulations and decisional law. (See Estate of Cohen (1971) 4 Cal.3d 41, 49 [92 Cal. Rptr. 684, 480 P.2d 300]; Estate of Morse (1970) 9 Cal. App.3d 411, 415 [88 Cal. Rptr. 52].) (1b) Whether a given formulation constitutes an ascertainable standard, however, depends upon the effect given by state law to the language. (E.g., Peoples Trust Company of Bergen County v. United States (3d Cir.1969) 412 F.2d 1156, 1159; see Morgan v. Commissioner (1940) 309 U.S. 78, 80-81 [84 L.Ed. 585, 588-589, 60 S.Ct. 424].)
The implementing federal administrative regulations provide some guidance in determining whether a given standard is properly ascertainable. "A power is limited by such a standard if the extent of the holder's duty to exercise and not to exercise the power is reasonably measurable in terms of his needs for health, education, or support (or any combination of them). As used in this subparagraph, the words `support' and `maintenance' are synonymous and their meaning is not limited to the bare necessities of life. A power to use property for the comfort, welfare, or happiness of the holder of the power is not limited by the requisite standard. Examples of powers which are limited by the requisite standard are powers exercisable for the holder's `support,' `support in reasonable comfort,' `maintenance in health and reasonable comfort,' `support in his accustomed manner of living,' `education, including college and professional education,' `health,' and `medical, dental, hospital and nursing expenses and expenses of invalidism.' In determining whether a power is limited by an ascertainable standard, it is immaterial whether the beneficiary is required to exhaust his other income before the power can be exercised." (26 C.F.R. § 20-2041-1, subd. (c)(2).) These provisions are lenient to a fault, equating, for example, "support," whose "meaning is not limited to the bare necessities of life," with "an ascertainable standard relating to... support" and "health" with "an ascertainable standard relating to ... health."
*807 In determining whether Susan's power to invade "for her own use and need as she may determine" was properly limited so as to qualify as a limited power of appointment, we are not troubled by the meaning to be accorded the word "use" or phrase "her own use." This part of the formulation limited the power to invade to Susan's personal use and precluded, for instance, invasions for gifts to others. (Hardy v. Mayhew (1910) 158 Cal. 95, 100 [110 P. 113].)
The principal difficulties are associated with the word "need." In one federal case "needs" has been construed as creating a limited power, but only because the controlling state law required actual financial or physical necessity. (Pittsfield National Bank v. United States (D.Mass. 1960) 181 F. Supp. 851, 853-854.) We on one occasion equated "needs" with "support." (Taylor v. George (1949) 34 Cal.2d 552, 558 [212 P.2d 505].) We were not using "support" in the manner now involved, however. Instead we were determining that a will provision that life insurance "`is and will be sufficient for his needs so far as any contribution from me is concerned'" was intended to indicate that the insurance proceeds were intended as satisfaction of a court-imposed support obligation to a minor child and that, since they exceeded the obligation, no other claim for support would be allowed against the estate.
What Taylor does demonstrate relevant to our present inquiry is that the concept of need or needs is a fluid one with a meaning which varies with and is to be derived from context. (Cf. People v. Barksdale (1972) 8 Cal.3d 320, 328 [105 Cal. Rptr. 1, 503 P.2d 257].) Here a widow has the power to invade a trust consisting of the entire community property and the limited separate property of her husband. Were we confronted with a dispute between the widow and the remaindermen over the propriety of an invasion, we would not adopt a grudging and narrow interpretation of need. The interpretation we would adopt in that situation is the one to which we must now look to determine whether "an ascertainable standard relating to ... health, education, support or maintenance" is established. (Cf. Strite v. McGinnes (3d Cir.1964) 330 F.2d 234, 238.)
There is no rational basis in the instant case to define "need" in terms of a dollar amount or in terms of an existing or identifiable standard of living. Without excluding the possibility that some proposed or actual invasion might be deemed so inappropriate as to be impermissible, we would in general interpret the power granted as permitting virtually any invasion for any personal expense or standard of living adopted by Susan. Such conclusion is bolstered by language describing the need to be "as she may determine." (Cf. Ewing v. Rountree (M.D.Tenn. 1964) 228 F. Supp. 137, *808 142, fn. 9.) There is no otherwise ascertainable standard of any nature set out in the decree, and there is no language which particularly purports to establish a standard of need related to even one of the four permissible purposes which are associated with a limited power.[6]
(3a) We conclude without looking beyond the decree of distribution that it establishes a general power of appointment. (4) Ordinarily such a decree is a conclusive determination of the validity, meaning and effect of the will and the rights of the parties thereunder even where the decree may be contrary to the testamentary document. (Estate of Callnon, supra, 70 Cal.2d 150, 156.) This does not, however, preclude reference to the will to resolve ambiguities in the decree (id. at p. 157; Estate of Cooper (1969) 274 Cal. App.2d 70, 75 [78 Cal. Rptr. 740]), or to establish the existence of a contract limiting distributive rights (Brown v. Superior Court (1949) 34 Cal.2d 559, 562-565 [212 P.2d 878]). Assuming the applicability of either or both doctrines in the present case would not, however, lead us to a different conclusion.[7]
(5) Even if the power to invade is limited to "support, maintenance, care and comfort ... including a comfortable dwelling, good food and raiment, health and/or hospital service, travel and congenial diversions," the power nevertheless remains unlimited by an ascertainable standard. "A power to use property for the comfort, welfare, or happiness of the holder of the power is not limited by the requisite standard." (26 C.F.R. § 20-2041-1, subd. (c)(2).) Among the purported limitations which have been held inadequate to limit a power are "comfort and well-being" (Miller v. United States (3d Cir.1968) 387 F.2d 866, 869), "benefit" (Strite v. McGinnes, supra, 330 F.2d 234, 239-240), "welfare and well-being" (Estate of Effie Kells Jones (1971) 56 T.C. 35, 40-41), and "care, comfort, and enjoyment" *809 (Stafford v. United States (E.D.Wis. 1964) 236 F. Supp. 132, 134). (3b) Unquestionably ascertainable standards could be provided for dwelling, food, raiment, and hospital and health services; but when without other, more precise limitations the quality of a dwelling is to be measured by how "comfortable" it is, and the quality of food and raiment by how "good" they are, such standards are not ascertainable. Even if travel might be regarded as related to support, maintenance, or education for purposes of satisfying the statute, the will was bereft of any standard of travel. Susan was free to invade the corpus for travel whenever, wherever and for whatever purpose she chose. Only with the utmost difficulty could "diversions" be forced into any of the statutorily authorized purposes for invasion within the scope of a limited power. When the nature of such diversion is to be limited only by what is "congenial," the standard must be deemed completely unascertainable. It is thus manifest that the will utterly fails, either by aiding in the construction of the decree or evidencing contractual responsibilities, to demonstrate an "ascertainable standard relating to the health, education, support, or maintenance" of Susan. (§ 13692, subd. (a).)
(6) "The object of Congress is to include in a decedent's estate, regardless of ... gossamer distinctions ... about powers, special powers, powers in trust, and the like, all economic value which a decedent was in a position to divert to his own use if he desired." (Miller v. United States (W.D.Pa. 1967) 267 F. Supp. 182, 184, revd. on other grounds, supra, 387 F.2d 866.) We can impute no lesser purpose to the Legislature in its enactment of section 13691 et seq. (see § 13648) and construe them accordingly.
(7) In view of the foregoing it is apparent that Susan was granted a general power of appointment. It is irrelevant that she never sought to exercise it (Miller v. United States, supra, 387 F.2d 866, 868-869) or that she quite possibly never planned to exercise it (Jenkins v. United States (5th Cir.1970) 428 F.2d 538, 546).
The remaining question is whether Susan surrendered the power in a manner sufficient to remove the corpus of the trust from her taxable estate. On July 6, 1968, nearly nine years after George's death, Susan signed and delivered a letter to the trustee which provided: "I have just learned that I have a right under the Nunn will and trust to withdraw principal at my election and for any purpose. [¶] I have no need for such right and so advise you hereby that I disclaim and renunciate it for all purposes and without limitation." Her attorney testified in explanation that he had been troubled about federal tax consequences from the inception of the trust and had concluded that the power might be deemed general. Accordingly he had her sign and deliver the renunciation. Susan died on April 7, 1969.
*810 (8) The release of a general power of appointment does not avoid inheritance tax consequences if the release is under circumstances where, were it a transfer of property owned by the decedent, it would be subject to inheritance taxation under division 2, part 8, chapter 4, article 3 (§§ 13641-13648) of the Revenue and Taxation Code. A power may also be disclaimed or renounced, and "A disclaimer or renunciation of ... a power of appointment shall not be deemed a release of such power." (§ 13697; see also IRC, § 2041, subd. (a) (2); 26 C.F.R. § 20-2041-3, subd. (d).) (9) An effective renunciation or disclaimer precludes taxation of the power. (Ewing v. Rountree, supra 228 F. Supp. 137, 143; cf. 26 C.F.R. § 20-2041-3, subd. (d) (6).)
(10) To be effective as such, however, a renunciation or disclaimer of a power of appointment must be made within a reasonable time of learning of its existence. (26 C.F.R. § 20-2041-3, subd. (d)(6).) The Legislature has recently undertaken to define the reasonableness of the time within which a disclaimer can effectively be made. (Prob. Code, § 190.3; Stats. 1972, ch. 990, § 1, pp. 1806-1807.) This section, though not controlling since enacted after the operative facts in the instant case, provides in relevant part that a disclaimer of an interest created under a will is timely if filed within nine months of the testator's death. Thereafter the disclaimant has the burden of proving reasonableness, and in some instances disclaimers made more than one year after the date of the testator's death are conclusively presumed untimely.
(11) As previously noted, it was nearly nine years after George's death when Susan wrote to the trustee, indicating she had "just learned" of her power to invade "for any purpose" and chose to renounce such power. Her attorney's testimony indicated that what was belatedly perceived were the tax consequences, not the existence of the power itself. Inasmuch as Susan herself signed the joint and mutual will making identical provision for George should she predecease him, and for many years drew benefits under the will, it is naive to suppose that she was unaware of the existence of the power of appointment. The only reasonable conclusion is that she knew of the power at all relevant times and purported to renounce or disclaim it only on learning of the tax consequences. We so find. (Code Civ. Proc., § 909.) It is knowledge of the power, not knowledge of the tax consequences, that is crucial in determining the reasonableness of the time to renounce. We need neither a subsequently enacted statute nor lengthy discussion of authorities from other jurisdictions to conclude that the lapse of nine years from George's death and seven years from the decree of distribution to the purported renunciation was not timely.
*811 The letter of renunciation could have been effective to terminate Susan's power to invade only if construed as a release. As previously noted, however, even a release of a general power does not inevitably remove the property subject to the power from the taxable estate. (§ 13697.) (12) In the instant case the property remains in the taxable estate because the release was, in essence, a transfer for inadequate consideration (§ 13641) in which the transferor retained a life income or interest (§ 13644). Additional evidence might also establish the release as a transfer in contemplation of death. (§ 13642.) Since there was no consideration whatever for the release, the entire value of the trust subject to the power is includible in the estate.
It appears that the inheritance tax of George's estate was improperly computed and paid on the entire community property. (See Estate of Carson (1965) 234 Cal. App.2d 516, 523-525 [44 Cal. Rptr. 360].) As in Estate of Kingman (1972) 26 Cal. App.3d 220, 222-223 [103 Cal. Rptr. 208], the Controller has agreed to a recalculation of the inheritance tax payable on George's estate with a corresponding credit to be given against the tax liability for Susan's estate. In light of this concession we need not determine whether such a credit is mandatory.
The order is reversed and the cause remanded for further proceedings consistent with the opinion.
McComb, J., Tobriner, J., Mosk, J., Burke, J., Sullivan, J., and Clark, J., concurred.
NOTES
[1] He also appeals from a judgment sustaining objections to the inheritance tax appraiser's report. Such a judgment is not appealable (Prob. Code, § 1240), and the appeal therefrom is dismissed.
[2] The issues herein arose prior to the time inheritance tax appraisers were replaced by inheritance tax referees. (Stats. 1970, ch. 1282, § 6, pp. 2326-2327, operative July 1, 1971.)
[3] The relevant portions of the mutual will read:

"FIRST: We declare that we are husband and wife, and that we have no children or issue of any deceased children; and that all of our property is community property under the California law with the exception of the following assets which are the separate property of SUSAN LINTHICUM NUNN, to wit: 1182 shares of R.J. Reynolds Tobacco Co., new Class B stock, three diamond rings and one sapphire and diamond bracelet; and with the exception $1,700.00 which is the separate property of GEORGE LEE NUNN.
".... .... .... .... .... .
"THIRD: In the event that my wife survives me, then I, GEORGE LEE NUNN, do hereby give, devise and bequeath to my wife, SUSAN LINTHICUM NUNN, a life estate in all the rest, residue and remainder of my estate, of every kind and description, whether real, personal or mixed and wheresoever situated, during the term of her natural life, with the right on the part of my wife to invade the corpus for her own use and need as she may determine." (Italics added.)
".... .... .... .... .... .
"SEVENTH: The life estate with power to invade the corpus, given to my wife, SUSAN LINTHICUM NUNN herein, is in lieu of all her community property rights and all other rights of inheritance from my estate and my wife, by signing this joint and mutual will, expressly consents and agrees to the distribution made to her by me herein and hereby waives all rights which she may otherwise have to community property and all other rights of inheritance from my estate except as in this Will provided."
Paragraphs Third and Seventh were duplicated with appropriate change in the name of the beneficiary by paragraphs Eighth and Eleventh in the provisions pertaining to Susan's estate.
[4] All statutory references are to sections of the Revenue and Taxation Code unless otherwise indicated.

Insofar as it is relevant section 13696 provides: "If at the time of his death a decedent has a general power of appointment with respect to property, the exercise of the power is subject to this part as a transfer of the property from the decedent to the person to whom the property is appointed and the decedent's failure to exercise the power is subject to this part as a transfer of the property from the decedent to the person to whom the property passes by virtue of the nonexercise of the power...."
Section 13692 in pertinent part provides: "`General power of appointment' means a power which is exercisable in favor of the decedent, his estate, his creditors, or the creditors of his estate, provided that the following shall not be deemed to be general powers of appointment: (a) A power to consume, invade, or appropriate property for the benefit of the decedent which is limited by an ascertainable standard relating to the health, education, support, or maintenance of the decedent.
".... .... .... .... .... . ."
Section 13693 reads: "`Limited power of appointment' means a power which does not qualify under the preceding section as a general power of appointment."
[5] The Internal Revenue Code of 1954 will hereinafter be referred to as IRC. Relevant portions of IRC section 2041 provide:

"(a) IN GENERAL.  The value of the gross estate shall include the value of all property 
".... .... .... .... .... . .
"(2) POWERS CREATED AFTER OCTOBER 21, 1942.  To the extent of any property with respect to which the decedent has at the time of his death a general power of appointment created after October 21, 1942....
".... .... .... .... .... .... .... .... .... . .
"(b) DEFINITIONS.  For purposes of subsection (a) 
"(1) GENERAL POWER OF APPOINTMENT.  The term `general power of appointment' means a power which is exercisable in favor of the decedent, his estate, his creditors, or the creditors of his estate; except that 
"(A) A power to consume, invade, or appropriate property for the benefit of the decedent which is limited by an ascertainable standard relating to the health, education, support, or maintenance of the decedent shall not be deemed a general power of appointment.
".... .... .... .... .... ."
This and certain other cited sections of the IRC were amended in 1962. (Pub. L. 87-834, § 18, subd. (a); 76 Stats. 1052.) The amendment, reflected in the quotation, is irrelevant to the issue at hand.
[6] Since the standards for invasion do not satisfy the statute, the existence and extent of Susan's fiduciary duties to the remaindermen are irrelevant. (See Peoples Trust Company of Bergen County v. United States, supra, 412 F.2d 1156, 1162; Strite v. McGinnes, supra, 330 F.2d 234, 240.)
[7] The will first provided for a power to invade the corpus for "use and need." The parties then agreed that the survivor would "seriously endeavor" to use only the income for "support, maintenance, care and comfort ... including a comfortable dwelling, good food and raiment, health and/or hospital service, travel and congenial diversions." This, however, was not to limit the right to invade the corpus "for the purposes hereinabove stated." For the present discussion we assume, without deciding, that this verbal quagmire was a contract precluding any invasion of the corpus by Susan until the income was exhausted, and then limiting her invasions to the listed purposes.

Only the presumed limitation on the purposes for invasion is of any relevance. "In determining whether a power is limited by an ascertainable standard, it is immaterial whether the beneficiary is required to exhaust his other income before the power can be exercised." (26 C.F.R. § 20-2041-1, subd. (c)(2).)