JULIUS SCHWABACHER

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa April 3, 1897.*

1. CRIMINAL LAW—*the crime of burglary may be committed either in the day time or night.* Under section 36 of the Criminal Code, as amended in 1885, (Laws of 1885, p. 73,) to constitute a crime burglary the time when the crime was committed, whether day or night, is material only in determining the minimum sentence.

2. SAME—*a house does not cease to be a dwelling, though occupants are temporarily absent.* A dwelling house does not cease to be such, within the meaning of section 36 of the Criminal Code, though its occupants are temporarily absent, as in such case the intention to return is the controlling consideration.

3. SAME—*where specific intent is the essence of a crime, intoxication of accused may be shown in defense.* Where, under an indictment, it is necessary to prove a specific intent on the part of the accused in order to establish the crime, it may be shown in defense that the accused was at the time so intoxicated as to be incapable of forming the intent, and an instruction to the contrary is erroneous.

4. PLEADING—*criminal—not a variance to prove burglary in the night time where indictment is silent as to time.* Where an indictment for burglary is silent as to whether the crime was committed in the day time or the night time, it is not a variance to prove that the crime was committed in the night.

5. SAME—*effect as to minimum sentence where indictment fails to allege burglary in night time.* Where an indictment for burglary fails to allege that the offense was committed in the night time, the minimum sentence to be imposed on conviction must be that provided for burglary in the day time.

6. INSTRUCTIONS—*when instruction which invades jury's province will not reverse.* Where an indictment charges burglary in the night in

one count and is silent as to time in another, an instruction as to the form of the verdict which fixes the minimum sentence at five years will not reverse, where the fact that the offense was committed in the night is not controverted.

WRIT OF ERROR to the Circuit Court of Peoria county; the Hon. N. E. WORTHINGTON, Judge, presiding.

I. C. EDWARDS, G. B. FOSTER, and J. A. WEIL, for plaintiff in error:

Bouvier thus defines a dwelling house: "A building inhabited by man; a house usually occupied by the person there residing and his family." Bonner's Law Dictionary: "The apartment, building or cluster of buildings in which a man, with his family, resides."

What was once a dwelling house may cease to be such, though no change is made. 1 Bishop on Crim. Law, secs. 295, 296; *Hooker* v. *Commonwealth*, 13 Gratt. 763; *State* v. *Clark*, 7 Jones, (N. C.) 167.

A building is not a dwelling house, though finished and furnished for abode and used for taking meals and other purposes, unless the person occupying it, or some one of his family or servants, sleeps in it. 1 Bishop on Crim. Law, sec. 296.

The sleeping in a house at night fixes its character whether or not it is a dwelling house, for a house which is only occupied and resided in during the day is not considered a dwelling house. *United States* v. *Johnson*, 2 Cranch, 21.

M. T. MOLONEY, Attorney General, (T. J. SCOFIELD, M. L. NEWELL, and SAMUEL RICHOLSON, of counsel,) RICHARD J. COONEY, State's Attorney, and FRANK J. QUINN, Assistant State's Attorney, for the People:

It is not necessary that any person should in fact actually be in the house at the time a burglary is committed, to constitute it a dwelling house; nor does a temporary absence of the occupants, even though for the

time being they may have established another dwelling house, destroy the character of a building to the degree that it ceases, from this fact, to be a dwelling house. 2 Wharton on Crim. Law, 319; 3 Greenleaf on Evidence, sec. 79; 2 Am. & Eng. Ency. of Law, 672.

The house in which a man has his true, fixed home, and to which, whenever he is absent, he has an intention of returning, is his dwelling house. 10 Mass. 183; 11 La. 175; 5 Metc. (Ky.) 187; 4 Barb. 505; 1 Bosw. 673.

Mr. JUSTICE CARTER delivered the opinion of the court:

Plaintiff in error was convicted of the crime of burglary at the February term, 1895, of the Peoria circuit court, and sentenced to imprisonment in the penitentiary for the term of five years. He brings this record here for a review on writ of error.

Plaintiff in error was an unmarried man of about the age of thirty-two years, the son of respectable parents, with whom he lived in Peoria. Shortly after midnight of the 8th of May, 1894, he was discovered in the dwelling house of Mrs. Bell, located almost directly across the street from his parents' home. Mrs. Bell was not at home, and no one was in the house when it was broken open. He had entered the house by breaking through one of the windows and had gone up stairs, lighted the gas, and broken into a dresser in one of the rooms and taken out a lot of silverware and other valuables which had been placed there by Mrs. Bell, and laid them in a pile upon the bed. He was discovered by a member of a family living in the adjoining house, who telephoned to the police. When the officers came they fired pistols on the outside, which seems to have alarmed him and he started to leave the house, when he was arrested. It seems that the curtains were up and there was nothing to obscure the view of outsiders of what was going on in the house when the gas was lighted by plaintiff in error. Occupants of the adjoining house had been aroused by a

noise as of the crashing of glass. Plaintiff in error seems, from the evidence, to have arisen from his bed at home a few minutes after retiring, and, with his night shirt still on, to have dressed himself in trousers and dress coat, Derby hat and patent leather shoes, without socks or underwear. He was apparently indifferent to his surroundings and to his arrest. He had for many years been addicted to the excessive use of intoxicating liquors, and had lived a life of reckless debauchery. He had, shortly after eleven o'clock of the same night, separated from a number of his companions who had made the rounds with him, visiting a number of saloons and other places, drinking to excess, and it was only a few minutes after he had been persuaded to retire for the night at his home, and had undressed and gone to bed, that he was found in Mrs. Bell's house, as before stated.

There was little or no dispute as to the principal facts of the occurrence, but it was contended by his counsel that defendant was of unsound mind and incapable of forming an intent to commit the alleged crime, and was not criminally responsible. Soon after the occurrence he was pronounced insane by several physicians and sent to Oak Lawn, a retreat for the insane at Jacksonville, where he remained for some time and until his trial. It was a controverted question on the trial whether or not he was of sound mind and mentally capable of distinguishing between right and wrong. Various physicians and experts upon mental diseases were examined, but the jury found that he was not insane, and returned their verdict that he was guilty of burglary as charged in the indictment, and fixed his punishment at five years in the penitentiary.

The indictment contained four counts. The first two, in substantially the same language, charged in appropriate words that the defendant broke and entered the dwelling house of Mrs. Frankie Bell in the *night time*, with intent to steal, etc. The other two counts charged

in appropriate language that he broke and entered the same dwelling house with intent to steal, etc., but they contained no allegation as to the time when the offense was committed,—whether at day or night.

The court instructed the jury, at the request of the People, among other things, as follows:

"If you find the defendant guilty of burglary as charged in the indictment, you shall also find his age, and if he is over twenty-one years of age your verdict may be as follows:

"We, the jury, find the defendant, Julius Schwabacher, guilty of burglary as charged in the indictment, his age to be...... years, and fix his punishment at......years in the penitentiary.

..............................*Foreman.*

—"Writing in his age as near as you can, and fix his term of imprisonment in the penitentiary at not less than five years nor more than twenty years."

Counsel for plaintiff in error insist that the court erred in giving this instruction to the jury. It is said that, as plaintiff in error was on trial on all four of the counts of the indictment, the jury would have been authorized to find him guilty under the last two counts or under any count of the indictment, and to fix his punishment as prescribed by the statute,—that is, they would have been authorized to find him guilty of burglary as charged in the third and fourth counts, and to fix his punishment at any term of years not less than *one* nor more than twenty years in the penitentiary,—but that the instruction in question invaded the province of the jury, and arbitrarily directed them, if they found him guilty as charged in the indictment, to fix his punishment at not less than five years.

At common law burglary could be committed only in the night time, and it was necessary to allege in the indictment that the breaking and entering was in the night time. But the law in this respect has been materially changed by our statute. Section 36 of the Criminal Code

is as follows: "Whoever willfully and maliciously and forcibly breaks and enters, or willfully and maliciously, without force, (the doors or windows being open,) enters into any dwelling house, kitchen, office, shop, storehouse, warehouse, malthouse, stillinghouse, mill, pottery, factory, wharfboat, steamboat or other water craft, freight or passenger railroad car, church, meeting house, school house or other building, with intent to commit murder, robbery, rape, mayhem or other felony, or larceny, shall be deemed guilty of burglary, and be imprisoned in the penitentiary for a term not less than one year nor more than twenty years: *Provided, however*, that whoever willfully and maliciously and forcibly breaks and enters, or willfully and maliciously, without force, (the doors or windows being open,) enters into any dwelling house in the night time, with intent to commit murder, robbery, rape, mayhem or other felony, or larceny, shall, on conviction, be imprisoned in the penitentiary for a term of not less than five years nor more than twenty years: *Provided, further*, that if, at the time of committing the offense mentioned in the proviso, such person shall be found with any deadly weapon, deadly drug or anæsthetic upon his person or in his possession, he shall, on conviction, be punished by imprisonment in the penitentiary for any term of years not less than five." (Laws of 1885, p. 73.)

It would seem clear from this provision of the statute that to constitute the crime of burglary generally, the time of its commission, whether day or night, is immaterial, and that it becomes material only under the proviso to the section to determine whether the crime has been committed under the aggravated circumstances therein mentioned, so that the minimum of punishment, instead of being one year, shall not be less than five years. The crime of burglary is defined and the punishment provided by the first part of the section, and the proviso thereto merely provides for increased punishment when it is

committed in the aggravated form therein mentioned. It would therefore seem clear that under a count framed under the first part of the section for burglary generally, without specifying whether committed at day or night, as the last two counts in this indictment were framed, the accused might be found guilty, where the evidence was otherwise sufficient, even though it appeared the offense was committed in the night time. But in such a case the punishment would be from one to twenty years, at the discretion of the jury, and not from five to twenty years. This question was practically so decided in *Bromley* v. *People*, 150 Ill. 297, where it was said, among other things (p. 302): "Applying to the case of a burglary not alleged in the indictment to have been committed in the night time, the rule above quoted from Bishop, (1 Bishop on Crim. Proc. sec. 84,) and that which seems to be the doctrine of *Harris* v. *People, supra,* (44 Mich. 305,) *Summers* v. *State, supra,* (9 Tex. App. 396,) and *Bravo* v. *State, supra,* (20 Tex. App. 188,) it would seem that only the punishment provided for burglary in the least aggravated degree can be imposed." It would be burglary in either case, whether committed at night or in day time, and it cannot be correctly said that because the proof establishes the offense in its aggravated form it does not establish it in its less aggravated form. Where sufficient is proved to establish the offense, it would be altogether illogical to say there was a failure of proof, or a variance between the allegations and proof, simply because more was proved than alleged.

It follows, therefore, that the evidence, if otherwise sufficient, would have authorized the jury to find the accused guilty under either of the last two counts of the indictment, and had they done so, the minimum punishment as provided by the statute would have been one year instead of five years. It further follows, that by the instruction in question the court in effect withdrew from the jury the discretion vested in them of applying

the evidence to the last two counts of the indictment, and directed them to apply it to the first two, where the minimum punishment would be greater. It cannot be doubted that, as a general rule, it would be error to do this, for it is not a case where the evidence was not applicable to the counts in question, but one where the evidence was applicable to each and all the counts, and the court directs its application to those requiring the greater punishment. It is, however, certainly true that under the special facts of this case the evidence was more directly applicable to the first two counts, for it fitted the allegation that the burglary was committed in the night time, and there was no pretense that the occurrence did not take place in the night time. Had there been any question of fact as to whether it was in the day or night time, it is very clear that serious and harmful error would have been committed by the giving of the instruction. But there was none, and while it was within the province of the jury to render a verdict under the last two counts, they could not have done so without undue sensibility manifested in favor of the accused in refusing to give to the fact proved, that the offense was committed in the night time, the effect prescribed by the statute. While, therefore, we regard the instruction as technically incorrect as an invasion of the province of the jury, and one which in many cases would lead to harmful results, still it appears to be clear that the just legal rights of the accused were not in this case injuriously affected by it, for, if guilty of burglary at all, he was guilty of burglary under the aggravated circumstance of having committed it in the night time, as mentioned in the proviso to the above section of the statute. Our conclusion therefore is, that no harmful error was committed in this respect so as to justify a reversal on that ground.

The question chiefly contested by counsel is, was the building burglarized a "dwelling house," within the meaning of that term when used in defining the crime of bur-

glary? It is used in our statute in the same sense it was at common law and must be given the same meaning. Each count of the indictment charges that the defendant "did break and enter the dwelling house of Mrs. Frankie Bell." The allegation that the building was a dwelling house was a material one, and no conviction could be sustained without proof that the building was a dwelling house. The building was erected for a residence. Mrs. Bell owned it, and had furnished and occupied it as her home for about two years prior to the burglary, except that on the 10th of July, 1893, as she stated in her testimony, she "left the house as any one would in leaving a house to be gone some time." She testified also that she sent her papers, and some of her more valuable silverware, to a bank in the city for safe keeping; that many of her household effects were put in packing boxes, trunks and large drawers of dressers. When she left she seems to have gone to Chicago, and remained away until the 14th of February, following, when she returned and only remained in the house for a day. Speaking of the condition of things there at that time she says: "Everything of value had been put away and a great many of my possessions were packed in packing boxes." As a reason for leaving the window curtains rolled up she stated, "I wanted to come home and find that my curtains were not full of dust." The carpets were left upon the floors and the beds undisturbed. The gas was left turned on, ready for immediate use. She left a man in charge of the barn and grounds, but no one in or to look after the house.

It is well settled that to constitute a building a dwelling house it is not necessary that any person should be actually in the house at the time a burglary is committed. Nor will a dwelling house cease to be such because of the temporary absence of its occupants, even though another dwelling place may be established for the time being. In all such cases the intention to return is the controlling consideration. Thus it is said in Green-

leaf on Evidence, (vol. 3, sec. 79): "It is not necessary, however, that the inhabitants be within the house at the moment, for burglary may be committed while all the family are absent for a night or more, if it be *animo revertendi.*" Wharton, in his work on Criminal Law, (vol. 2, p. 319, sec. 1573,) after stating the rule as above, says: "Burglary may be committed in a house in the city in which the prosecutor intended to reside on his return from his summer residence in the country, and to which, on going into the country, he had removed his furniture from his former residence in town, though neither the prosecutor nor his family had ever lodged in the house in which the crime is charged to have been committed, but merely visited it occasionally." In a note on page 672 of 2 Am. & Eng. Ency. of Law it is said: "A house is no less a dwelling house because at certain periods the occupier quits it, or quits it for a temporary purpose. 'If A has a dwelling house, and he and all his family are absent a night or more, and in their absence, in the night, a thief breaks and enters the house to commit felony, this is burglary,' (citing authorities.) So if A have two mansion houses, and is sometimes with his family in one and sometimes in the other, the breach of one of them in the absence of his family is burglary. * * * The prosecutor, being possessed of a house in Westminster, in which he dwelt, took a journey into Cornwall with intent to return, and moved his wife and family out of town, leaving the key with a friend to look after the house. After he had been absent a month, no person being in the house, it was broken open and robbed. He returned a month after, with his family, and inhabited there. This was adjudged burglary. In these cases the owner must have quitted his house *animo revertendi* in order to have it still considered as his mansion, if neither he nor any part of his family were in at the time of the breaking and entering. 2 East's P. C. 496."

While the testimony of Mrs. Bell was not explicit as to her intention to return, and in some parts of it tended to show indecision on that question, we think that, taking it altogether, the jury were authorized to find that she did intend to return, and that it was therefore her dwelling house. As a matter of fact she did return and occupy it as her home. It was not shown that she established a home anywhere else, and she did not disfurnish the house and remove her goods without any settled resolution to return, but rather inclining to the contrary, as in 2 East's P. C. 496. The court in that case laid stress upon two important facts wanting in this evidence,—that is to say, the removal of the goods "*without any settled resolution to return, but rather inclining to the contrary.*" There the prosecutor also moved to another dwelling house owned by him, whereas Mrs. Bell is not shown to have established herself and family in any other house, or even contemplated doing so. While the evidence on this branch of the case is not as clear as perhaps it might have been made had more attention been paid to it on the trial, still we cannot say it is not sufficient to support the verdict.

It is next contended that the medical expert testimony and other evidence tending to show defendant's mental unsoundness were sufficient to raise a reasonable doubt of his sanity, and that the verdict and judgment are erroneous for that reason. It is argued that the evidence shows that his parents had abundant means; that he resided with them and that his every want was supplied by them; that he had no motive for the commission of the crime; that he had no use for the articles he gathered together while in Mrs. Bell's house; that he took no precautions to prevent detection; that the house he entered was that of a near neighbor; that he made no effort to escape; that he was intoxicated and had for many years been an habitual drunkard, and had for many years suffered from a loathsome disease which affected

his mind; that he was both a physical and mental wreck, incapable of distinguishing right from wrong or of being conscious of the moral quality of any act he might perform, and that the occurrence originated in a crazy freak caused by his drunken and demented condition.  It can not be denied that there was evidence tending to prove this contention, and several experts in mental diseases testified that he was insane and not responsible for his acts.  But there was also much evidence to the contrary, tending to show that he was sane and responsible.  It was a question pre-eminently for the jury.  At the same time the conflict in the evidence was such as to make it of the greatest importance that the instructions given to the jury should be accurate statements of the law, and as the judgment must be reversed for another reason we deem it inadvisable to comment to any extent upon the evidence.

At the instance of the People the court gave to the jury the following instruction:

"You are further instructed that drunkenness is no excuse for the commission of any crime or misdemeanor, unless such drunkenness was occasioned by fraud, contrivance or force of some other person, for the purpose of causing a perpetration of an offense.  And where the act of a defendant would be criminal if committed when he was sober, the fact that he committed such act while intoxicated will constitute no defense, unless his intoxication was caused by some other person for the purpose above stated,—and this is the rule even where such intoxication is so extreme as to make such defendant unconscious of what he was doing."

It is undoubtedly true that at common law drunkenness was no excuse for crime; nor is it under the statute, except as therein provided.  But where, as under the indictment in this case, it is necessary to prove a specific intent before a conviction can be had, it is competent to prove that the accused was at the time wholly incapable

of forming such intent, whether from intoxication or otherwise. The breaking and entering the house in the night time alone did not constitute the crime of burglary, but it was necessary to prove that the act was done with the specific intent alleged in the indictment,—that is, to steal the goods and chattels therein of Mrs. Bell. In *Bartholomew* v. *People*, 104 Ill. 601, in delivering the opinion of the court, Mr. Justice SCHOLFIELD said (p. 606): "At common law, where it required a particular intent in the doing of an act to constitute crime,—as, for instance, larceny, where the intent to steal must accompany the act of taking,—it is held it may be shown in defense that the party charged was intoxicated to that degree that he was incapable of entertaining the intent to steal, and that he neither then, nor afterwards, yielded it the sanction of his will. (1 Bishop on Crim. Law, (3d ed.) sec. 490; *United States* v. *Routenbush*, 1 Baldw. 517; *Swan* v. *State*, 4 Humph. 136; *Pigman* v. *State*, 4 Ohio, 555; *Kessy* v. *State*, 3 Sm. & M. 518. See, also, 1 Wharton on Crim. Law,— 7th ed.—sec. 41.) It was therefore competent to make the defense relied upon."

The precise instruction here being reviewed was condemned by this court in *Crosby* v. *People*, 137 Ill. 325, in an indictment for an assault with intent to murder, and the judgment was reversed solely for the error in giving the instruction. After reviewing the authorities Mr. Justice SHOPE, in delivering the opinion, said (p. 343): "Drunkenness was, therefore, at common law as under our own statute, no excuse for crime, but where the nature and essence of the offense is, by law, made to depend upon the state and condition of the mind of the accused at the time, and with reference to the acts done and committed, drunkenness, as a fact affecting the control of the mind, is proper for the consideration of the jury, for if the act must be committed with a specific intent to constitute the crime charged, and the defendant is incapable of forming any intent whatever, the offense has not been

committed." It was there further said that the statute has not changed the common law, and that "the question of intent and of the existence of the particular intent was one of fact to be determined by the jury, and the defendant had, under the indictment, the right to have that matter submitted to and passed upon by the jury." This case must be governed by the same rule.

It follows the court erred in giving to the jury the above instruction, and for that error the judgment must be reversed and the cause remanded.

*Reversed and remanded.*