[Crim. No. 11943. Third Dist. July 11, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
CLAY GUTHRIE, Defendant and Appellant.

**[Certified for partial publication.*]**

## COUNSEL

James R. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Willard F. Jones and Edmund D. McMurray, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SIMS, J.**—Defendant appeals from the judgment after a jury convicted him of first degree burglary.[1] (Pen. Code, §§ 459, 460.) In this published portion of our opinion, we address defendant's contentions that (1) the phrase "inhabited dwelling house" in Penal Code section 460 is unconstitutionally vague; and (2) the trial court erroneously refused to instruct the jury that defendant could not be convicted of first degree burglary if the jury had a reasonable doubt that defendant knew or believed the burglarized dwelling house was inhabited at the time of the burglary. We address other contentions of defendant in an unpublished portion of this opinion pursuant to rule 976.1 of the California Rules of Court. We disagree with each of defendant's contentions and affirm.

---

[1]Charles Day, a codefendant, was tried with defendant for the same crime and was also convicted. On September 22, 1982, this court dismissed Day's appeal pursuant to California Rules of Court, rule 17(a).

## FACTS

On June 26, 1981, Randy Placy, William Greene, Roland Seigler and Earl Conklin lived together in a house at 3339 First Avenue, in Sacramento. Placy and Greene had signed a one-year lease and the tenants had furnished the residence with their own furniture.

Defendant, who had lived at 3339 First Avenue before Placy and Greene rented it, went by periodically to pick up his mail. He had neither a key to the house nor permission to enter. He had moved nearby to 2531 33d Street, where Gwendolyn McKnight and her four children also resided.

On June 26, 1981, Seigler was murdered at 3339 First Avenue. Placy slept there for two nights after the murder before leaving to stay with a friend. Greene, upset over the murder of his friend, left the residence immediately after the incident. He returned the next day to pick up clothing and personal items.

Both Placy and Greene intended to return to the house after they recovered from the shock of the incident. Neither of them told their landlord they were going to vacate the premises, nor did they cancel the utilities, file address changes with the post office, nor move any furniture out of the house.

Prior to July 5, 1981, Placy checked on the house daily. During this time, defendant asked Placy if he had received any mail, and Placy said no. Placy also told defendant that Placy was stopping by the house daily. Placy told the landlord that he and Greene intended to stay in the house.

Greene also returned to the house almost daily to pick up clothes and to see to it that everything was in order. He made sure that lights were kept burning, that music was playing, and that windows were locked. Greene spent the night of July 2 at the house and told the landlord that he and Placy would stay there for the remainder of the lease.

On July 4, Placy went out of town. Before leaving, he went by the house. Everything was secure. Greene also stopped by the house on the same day.

On the evening of July 5, Sacramento Police Officer Brian Holcomb and his partner were directed by radio to 3339 First Avenue. As the officers approached the house, Holcomb saw a black male holding a table running down an alley toward 33d Street. The man, later identified as defendant, was apprehended shortly after he crawled out a lower level window in the house at 2531 33d Street.

After police obtained McKnight's consent to search the house at 2531 33d Street, she pointed out furniture on the first floor that did not belong to the occupants of the house. When Placy and Greene returned to the house at 3339 First Avenue on July 6, they noticed numerous items missing. Many of these items were found in the 33d Street house.

The landlord at 3339 First Avenue testified that, after the homicide on June 26, 1981, Placy told him that he would notify him about whether he was going to move. The landlord and Placy had another conversation in which Placy said that the house had been burglarized and he would move as soon as he could. The landlord posted a three day notice to vacate on July 7, and the house was vacated during the second week of July.

Neither defendant Guthrie nor codefendant Day testified.

## DISCUSSION

## I

We address first defendant's argument that the phrase "inhabited dwelling house," as used in Penal Code section 460,[2] subdivision 1, defining first degree burglary,[3] is unconstitutionally vague.[4]

---

[2]All references to statutes are to the Penal Code unless otherwise indicated.

[3]Penal Code section 460, subdivision 1 provides that: "Every burglary of an inhabited dwelling house or trailer coach as defined by the Vehicle Code or the inhabited portion of any other building, is burglary of the first degree."

[4]Defendant's constitutional argument is framed by well recognized rules. "It is an established principle of constitutional law that '. . . a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' (*Connally* v. *General Const. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126]; see also *Smith* v. *Goguen* (1974) 415 U.S. 566, 572-576 [39 L.Ed.2d 605, 611-614, 94 S.Ct. 1242]; *Papachristou* v. *City of Jacksonville* (1972) 405 U.S. 156, 162 [31 L.Ed.2d 110, 115-116, 92 S.Ct. 839]; *People* v. *Barksdale* (1972) 8 Cal.3d 320, 327 [105 Cal.Rptr. 1, 503 P.2d 257]; Note, *The Void-for-Vagueness Doctrine in the Supreme Court* (1960) 109 U.Pa.L.Rev. 67.)" (*Bowland* v. *Municipal Court* (1976) 18 Cal.3d 479, 491-492 [134 Cal.Rptr. 630, 556 P.2d 1081].)

"The federal due process standard was recently restated in *Rose* v. *Locke* (1975) 423 U.S. 48 [46 L.Ed.2d 185, 96 S.Ct. 243]. Rejecting the contention that a statute prohibiting a 'crime against nature' was unconstitutionally vague, the high court observed: 'It is settled that the fair-warning requirement embodied in the Due Process Clause prohibits the States from holding an individual "criminally responsible for conduct which he could not reasonably understand to be proscribed." But this prohibition against excessive vagueness does not invalidate every statute which a reviewing court believes could have been drafted with greater precision. Many statutes will have some inherent vagueness for "[i]n most English words and phrases there lurk uncertainties." Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid. All the Due Process Clause requires is that the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden.' (*Id.*, at pp. 49-50 [46 L.Ed.2d at p. 188], citations omitted.)" (*People* v. *Superior Court (Hartway)* (1977) 19 Cal.3d 338, 345 [138 Cal.Rptr. 66, 562 P.2d 1315].)

Defendant acknowledges that the phrase, "inhabited dwelling house," as used in section 460, finds definitional support in section 459 which provides in relevant part that, "[a]s used in this chapter, 'inhabited' means currently being used for dwelling purposes, whether occupied or not."[5] However, defendant suggests that the foregoing definition is internally inconsistent and therefore fatally confusing. He suggests that if a dwelling house is "currently being used" then it must be "occupied," so that the definition provided by section 459 makes no sense. By his interpretation, the definition in section 459 would read: "'inhabited' means currently occupied whether occupied or not."

The fallacy of defendant's argument is the incorrect assumption that if a dwelling is "currently being used for dwelling purposes" then it must be presently occupied. We conclude that sections 459 and 460 can be readily harmonized by recognizing that "inhabited" and "occupied" have different meanings and that it is possible that a dwelling is "currently being used for dwelling purposes" even though it is temporarily unoccupied.

The definitional phrase at issue ("'inhabited' means currently being used for dwelling purposes, whether occupied or not") was added to section 459 in 1977. (Stats. 1977, ch. 690, § 3, p. 2220.) At the time of the 1977 amendment, the phrase "inhabited dwelling house" in section 460 sat, like a clothesline, with nearly 50 years of consistent judicial decisions hanging from it. Thus in *People* v. *Allard* (1929) 99 Cal.App. 591, at page 592 [279 P. 182], the court considered whether a home was "inhabited" within the meaning of Penal Code section 460 where a burglary occurred during a period of time when the occupants of the home "were just away for two or three days." The court held that a residence did not become *uninhabited* simply because the occupants were briefly absent from the house and had not indicated an intention to go live somewhere else. Numerous cases following *Allard* have held that a residence is still "inhabited" for purposes of Penal Code 460 even though the residents of the house are temporarily away from the premises, where they have indicated no intention to stop living there. (See e.g., *People* v. *Harris* (1968) 266 Cal.App.2d 426, 430 [72 Cal.Rptr. 423]; *People* v. *Tittle* (1968) 258 Cal.App.2d 518, 520, 524 [65 Cal.Rptr. 576]; *People* v. *Gilbert* (1961) 188 Cal.App.2d 723, 726 [10

---

[5]Section 459 provides: "Every person who enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse or other building, tent, vessel, railroad car, trailer coach, as defined in Section 635 of the Vehicle Code, any house car, as defined in Section 362 of the Vehicle Code, inhabited camper, as defined in Section 243 of the Vehicle Code, vehicle as defined by the Vehicle Code when the doors of such vehicle are locked, aircraft as defined by the Harbors and Navigation Code, mine or any underground portion thereof, with intent to commit grand or petit larceny or any felony is guilty of burglary. As used in this chapter, 'inhabited' means currently being used for dwelling purposes, whether occupied or not."

Cal.Rptr. 799]; *People* v. *Loggins* (1955) 132 Cal.App.2d 736, 738 [282 P.2d 961].) In *People* v. *Valdez* (1962) 203 Cal.App.2d 559, at page 563 [21 Cal.Rptr. 764], the court characterized the applicable rule using nearly the same words that are now challenged: "As defined in Penal Code section 460, a dwelling house is inhabited if a person resides therein even though it may be temporarily unoccupied. [Citations.]" (Accord *People* v. *Chavira* (1970) 3 Cal.App.3d 988, 992 [83 Cal.Rptr. 851], adopting the same interpretation for purposes of Pen. Code § 246.)[6]

Justice Kaus has remarked that "Courts have looked far afield for aids in construing statutes in such a way that language, which at first glance seems vague, acquires certainty. Therefore we proceed to examine what help we can get from sources other than the statute itself. [¶] First of all, if the statute has been judicially construed, such construction of the statutory words becomes part of the statute 'as if it had been so amended by the legislature.' (*Cramp* v. *Board of Public Instruction,* 368 U.S. 278, 285 [82 S.Ct. 275, 7 L.Ed.2d 285]; *Winters* v. *New York, supra,* [333 U.S. 507, 514 (92 L.Ed. 840, 849, 68 S.Ct. 665)])." (*In re Davis* (1966) 242 Cal.App.2d 645, 653 [51 Cal.Rptr. 702]; see also *People* v. *Davis* (1968) 68 Cal.2d 481, 485-486 [67 Cal.Rptr. 547, 439 P.2d 651]; *People* v. *Poulin* (1972) 27 Cal.App.3d 54, 60 [103 Cal.Rptr. 623]; 1 Witkin, Cal. Crimes (1963) § 25, p. 28.) ■ " 'It is a generally accepted principle that in adopting legislation the Legislature is presumed to have had knowledge of existing domestic judicial decisions and to have enacted and amended statutes in the light of such decisions as have a direct bearing upon them. [Citations.]' " (*Estate of McDill* (1975) 14 Cal.3d 831, 839 [122 Cal.Rptr. 754, 537 P.2d 874], quoting from *Buckley* v. *Chadwick* (1955) 45 Cal.2d 183, 200 [288 P.2d 12, 289 P.2d 242] [fn. omitted].)

■ We find no indication that, in enacting the 1977 amendment to section 459 at issue here, the Legislature intended to discard the long-standing distinction between inhabited and occupied dwellings acknowledged by *People* v. *Allard, supra,* and its progeny. To the contrary, the conclusion is inescapable that the 1977 amendment was designed to codify the distinction

---

[6]In *People* v. *Cardona* (1983) 142 Cal.App.3d 481 [191 Cal.Rptr. 109], Division One of the Fourth Appellate District considered the flip side of our coin. There the court held that defendant could not be convicted of first degree burglary of a dwelling house where renters had moved out of the house and had no intention of spending another night in the house, even though some of their property was still in the house at the time of the burglary. In our case, at the time of the burglary, victims Placy and Greene both intended to return to the house to live in it.

as expressed in nearly identical language in *People* v. *Valdez, supra*.[7] In accordance with that thick veneer of judicial gloss, we conclude that, for purposes of sections 459 and 460, the word "occupied" means that persons are actually present in a dwelling. Once this definition is accepted, then the language of section 459 makes sense on its face: " 'inhabited' means currently being used for dwelling purposes, whether occupied or not." As the cases have made clear, a dwelling is "currently being used for dwelling purposes" even if the tenant or owner is temporarily away and the dwelling is unoccupied.

Since we conclude that judicial decisions have supplied appropriate meaning to Penal Code sections 459 and 460, we hold that the statutes provide a reasonably certain definition of "inhabited dwelling house." Reasonable certainty is all that is required. (*People* v. *Superior Court* (*Hartway*), *supra*, 19 Cal.3d at p. 345; *People* v. *Victor* (1965) 62 Cal.2d 280, 300 [42 Cal.Rptr. 199, 398 P.2d 391]; *People* v. *Demery* (1980) 104 Cal.App.3d 548, 556 [163 Cal.Rptr. 814]; *Bosco* v. *Justice Court* (1978) 77 Cal.App.3d 179, 191 [143 Cal.Rptr. 468].)

## II

### A

■■■ Defendant next contends that the trial court erred in refusing to instruct the jury that he could not be convicted of first degree burglary if the jury had a reasonable doubt that he knew or believed the dwelling was not inhabited.[8]

---

[7]This conclusion is fortified by the rule that "When an accused is charged with an offense defined in terms subject to two reasonable constructions, the construction favorable to the defendant is ordinarily adopted. This does not mean, however, that the language of the statute must be stretched and strained beyond the limitation of reason. [Citation.]" (*People* v. *Malcolm* (1975) 47 Cal.App.3d 217, 222 [120 Cal.Rptr. 667].) In the instant case, defendant acknowledges (indeed contends) that his interpretation of the phrase in question leads to an absurd result.

[8]The trial court refused to give the following instruction proposed by defendant: "If you have a reasonable doubt as to whether or not the defendants knew or believed the dwelling was inhabited at the time of the burglary you may not convict the defendants of first degree burglary."

The court did, however, give these instructions at defendant's request:

"An inhabited dwelling house means a dwelling house which is currently being used for dwelling purposes, whether occupied or not.

"A rented house is not a currently inhabited dwelling house within the meaning of Penal Code 459 whenever new tenants have not moved in after the earlier tenants left to permanently reside elsewhere."

On its own motion, the trial court also gave this instruction:

"A dwelling house may be currently used for dwelling purposes even though it's [*sic*] occupants are temporarily absent therefrom so long as any of such occupants intends, at the time of the alleged burglary, to reoccupy it for dwelling purposes within a short period of time."

Defendant contends his proffered instruction was a mistake-of-fact defense instruction and that *People* v. *Hernandez* (1964) 61 Cal.2d 529 [39 Cal.Rptr. 361, 393 P.2d 673, 8 A.L.R.3d 1092] required the trial court to give it. In *Hernandez,* the Supreme Court held that a defendant in a statutory rape case was to be allowed to present evidence that he had a reasonable belief that the victim was over the age of 18 years. The Court reasoned that to disallow the defense in a prosecution for statutory rape would be to encourage the conviction of persons without criminal intent, in violation of the policies stated by sections 20 and 26.[9] *Hernandez* relied on *People* v. *Vogel* (1956) 46 Cal.2d 798 [299 P.2d 850], where the court allowed a defense in a bigamy prosecution to the effect that defendant had a reasonable and bona fide belief that he could remarry. *Hernandez* was followed in *People* v. *Mayberry* (1975) 15 Cal.3d 143 [125 Cal.Rptr. 745, 542 P.2d 1337], where the court held that, in a prosecution for rape by means of force or threat (Pen. Code, § 261, subds. 2 & 3), it was error for the trial court to refuse a defense instruction that defendant entertained a reasonable and bona fide belief that the victim voluntarily consented to have intercourse.

We do not reach the question of whether a mistake-of-fact instruction, based on a defendant's reasonable belief that a dwelling house is uninhabited, might be available in a prosecution for first degree burglary, because that issue is not properly before us. The trial court properly rejected defendant's proffered instruction on several grounds that make it unnecessary to consider whether such an instruction might be available in an appropriate case.

First, the proffered instruction did not state that defendant's knowledge be reasonable and bona fide, as required by *Vogel, Hernandez,* and *Mayberry.*[10] Rather, as proposed, the instruction required acquittal if the jury

---

[9]Section 20 provides: "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence."

Section 26 provides in relevant part: "All persons are capable of committing crimes except those belonging to the following classes:

"．　．　．　．　．　．　．　．　．　．　．　．　．　．　．　．

"Three—Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent.

"．　．　．　．　．　．　．　．　．　．　．　．　．　．　．　．

"Five—Persons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence."

[10]Compare CALJIC Nos. 10.23 and 10.41: "CALJIC 10.23 Rape—Belief as to Consent [¶] It is a defense to a charge of forcible rape that the defendant entertained *a reasonable and good faith belief* that the female person voluntarily consented to engage in sexual intercourse. If from all the evidence you have a reasonable doubt whether the defendant *reasonably and in good faith* believed she voluntarily consented to engage in sexual inter-

found a reasonable doubt as to *actual knowledge* by defendant of inhabitation. Consequently, the proposed instruction was an incomplete statement of applicable law, and the court properly rejected it on that basis. (*People v. Stewart* (1976) 16 Cal.3d 133, 140 [127 Cal.Rptr. 117, 544 P.2d 1317]; *People v. Partlow* (1978) 84 Cal.App.3d 540, 558-559 [148 Cal.Rptr. 744].)

Second, the trial court had no duty to give, *sua sponte,* a correct instruction on mistake-of-fact. ▮ A trial court has a duty, *sua sponte,* to correct and give a proposed defense instruction that incorrectly states the law where it appears that the defendant is relying on such a defense or if there is substantial evidence supportive of such a defense. (*People v. Stewart, supra,* 16 Cal.3d at p. 140.) ▮ Here, neither precondition of the trial court's duty to correct the instruction is present.

In the instant case, so far as the record discloses, the trial court was not put on notice that defendant was relying on a mistake-of-fact defense. The instruction proposed by defendant (*ante,* fn. 8) failed to tender a defense theory of mistake-of-fact. As we point out in part II-B of our opinion, *post,* the instruction can be reasonably construed not as a mistake-of-fact instruction at all but rather as an instruction that assumes actual knowledge is an element of the offense of first degree burglary. Nor could the trial court get a clue that the instruction was based on a mistake-of-fact defense from authorities cited in support of the instruction; there were none. Finally, the trial court could not have learned from defense counsel's cross-examination[11] or closing argument[12] that defendant was relying on a mistake-of-fact defense, because the defense focused on mistaken identity. Thus, in closing argument counsel contended the evidence failed to prove beyond a reasonable doubt that defendant was the man seen running from the burglarized house. Unless substantial evidence requires the giving of a defense instruction *sua sponte,* a defendant may not, on appeal, contend the trial court erred in failing to give an instruction on a theory never advanced to the court. (See *People v. Jurado* (1981) 115 Cal.App.3d 470, 492-493 [171 Cal.Rptr. 509]; compare *People v. Stewart, supra,* 16 Cal.3d at pp. 140-141.)

---

course, you must give the defendant the benefit of that doubt and acquit him of said charge." (Italics added.)

"CALJIC 10.40.1 ORAL COPULATION—BELIEF AS TO CONSENT [¶] It is a defense to a charge of forcible oral copulation that the defendant entertained *a reasonable and good faith belief* that the other person voluntarily consented to engage in oral copulation. If from all the evidence you have a reasonable doubt whether the defendant *reasonably and in good faith* believed such other person voluntarily consented to engage in oral copulation, you must give the defendant the benefit of that doubt and acquit him of said charge." (Italics added.)

[11]Defendant Guthrie called no witnesses on his behalf.

[12]The court instructed after the arguments of counsel.

A second reason the trial court had no duty to give a mistake-of-fact instruction *sua sponte* is that there was no substantial evidence that defendant had a reasonable belief the dwelling was uninhabited. In the instant case, neither defendant nor codefendant Day testified. Victim Placy told defendant that Placy was stopping by the house daily. No items of furniture or personal property had been moved out of the house; at the time of the burglary, the house was fully furnished. Victim Greene visited the house "almost daily" to make sure that lights were on, that music was left on, and that windows were locked. There was no substantial evidence to support any mistake-of-fact instruction that defendant had a reasonable belief the dwelling was uninhabited. (See *People* v. *Hampton* (1981) 118 Cal.App.3d 324, 330 [173 Cal.Rptr. 268].)

Finally, we note that, without notice defendant was relying on a mistake-of-fact defense, the trial court could have gummed up the works by instructing *sua sponte* on that theory. "[T]he duty to give instructions, *sua sponte,* on particular defenses and their relevance to the charged offense arises only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case. Indeed, this limitation on the duty of the trial court is necessary not only because it would be unduly burdensome to require more of trial judges, but also because of the potential prejudice to defendants if instructions were given on defenses inconsistent with the theory relied upon." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]; see *People* v. *Wickersham* (1982) 32 Cal.3d 307, 326 [185 Cal.Rptr. 436, 650 P.2d 311].) The record in this case indicates defendant relied on a defense of mistaken identity. That theory is manifestly inconsistent with a theory that defendant had a reasonable belief the house he broke into was uninhabited, and a *sua sponte* instruction on the latter theory could have created the "potential prejudice" that *Sedeno* warned against. (See *People* v. *Wickersham, supra,* 32 Cal.3d at p. 329.)[13]

B

We investigate another theory upon which it is suggested the instruction should have been given. Despite defendant's contention that the

---

[13]We reiterate that we do not reach the question of whether the law recognizes a defense of reasonable mistake that a dwelling is uninhabited in a prosecution for first degree burglary. As we have indicated, that issue was not tendered to the trial court. (But see *People* v. *Lopez* (1969) 271 Cal.App.2d 754, 760-761 [77 Cal.Rptr. 59]; *People* v. *Root* (1966) 246 Cal.App.2d 600, 606-607, fn. 5 [55 Cal.Rptr. 89]; compare *People* v. *Goldstein* (1982) 130 Cal.App.3d 1024, 1036-1037, mod. 132 Cal.App.3d 630a [182 Cal.Rptr. 207].)

instruction was based on a mistake-of-fact defense, the instruction appears to be one that assumes that actual knowledge of inhabitation of a dwelling house is an element of the offense of first degree burglary and focuses on the jury's duty to acquit if it has a reasonable doubt that the element of the offense has been proven. By this characterization, the proffered instruction becomes a "pinpoint instruction" which "may, in appropriate circumstances, relate the reasonable doubt standard for proof of guilt to particular elements of the crime charged . . . ." (*People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864, 885 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845]; see *People* v. *Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847]; *People* v. *Adrian* (1982) 135 Cal.App.3d 335, 339-340 [185 Cal.Rptr. 506].) Accordingly, we examine the suggestion that actual knowledge that a dwelling house is inhabited is an element of the offense of first degree burglary.[14] Failing to find any legislative sanction for this contention, we reject it.

■ At the outset, we note that "Penal Code section 6 declares in relevant part that 'No act or omission' accomplished after the code has taken effect 'is criminal or punishable, except as prescribed or authorized by this code, or by some of the statutes which it specifies as continuing in force and as not affected by its provisions, or by some ordinance, municipal, county, or township regulation. . . .' This section embodies a fundamental principle of our tripartite form of government, i.e., that subject to the constitutional prohibition against cruel and unusual punishment, the power to define crimes and fix penalties is vested exclusively in the legislative branch. (*People* v. *Knowles* (1950) 35 Cal.2d 175, 181 [217 P.2d 1]; *Harbor Comrs.* v. *Excelsior Redwood Co.* (1891) 88 Cal. 491, 493 [26 P. 375]; *People* v. *Hess* (1951) 104 Cal.App.2d 642, 685 [234 P.2d 65]; *In re Finley* (1905) 1 Cal.App. 198, 201 [81 P. 1041].)" (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].)

■ Section 459 explicitly provides that the mental state necessary to commit the crime of burglary is the specific intent "to commit grand or petit larceny or any felony." (See *People* v. *Markus* (1978) 82 Cal.App.3d 477, 481 [147 Cal.Rptr. 151].) Neither section 459 nor section 460 expressly requires that a defendant have knowledge that a dwelling is inhabited. We recognize that the Legislature knows how to write a requirement of actual knowledge into a penal statute. (See, e.g., Pen. Code, § 496; *People* v. *Roder* (1983) 33 Cal.3d 491, 504 [189 Cal.Rptr. 501, 658 P.2d 1302].) However, we address the possibility that knowledge of the inhabited character of the dwelling may be fairly implied from language in section 459. " '[W]hatever is necessarily implied in a statute is as much a part of it as

---

[14]Sections 459 and 460. (See fns. 3, 5, *ante.*)

that which is expressed.'" *(Welfare Rights Organization* v. *Crisan* (1983) 33 Cal.3d 766, 771 [190 Cal.Rptr. 919, 661 P.2d 1073], quoting *Johnston* v. *Baker* (1914) 167 Cal. 260, 264 [56 P.2d 259]; see *Garabedian* v. *Superior Court* (1963) 59 Cal.2d 124, 127 [28 Cal.Rptr. 318, 378 P.2d 590]; *People* v. *Hamilton* (1978) 80 Cal.App.3d 124, 132 [145 Cal.Rptr. 429] [knowledge that accident has occurred is element of offense defined by Veh. Code, § 20001 even though not expressly set forth in statute].)

Here it is suggested that knowledge of inhabitation is necessarily implied from language in section 459 providing in relevant part that, "Every person who enters any house . . . with intent to commit grand or petit larceny or any felony is guilty of burglary." Thus, the suggestion is made that the statute contemplates entry of a house with the intent to commit larceny or a felony inside it, so the statute assumes that a defendant must have knowledge of the interior of a house or dwelling and thus whether it is inhabited or not.

This suggestion is refuted by prior judicial interpretation of the statutes in question. ■ First, it is settled that the crime of first degree burglary is committed ". . . when any part of the body of the intruder is inside the premises." *(People* v. *Failla* (1966) 64 Cal.2d 560, 569 [51 Cal.Rptr. 103, 414 P.2d 39]; see also *People* v. *Lamica* (1969) 274 Cal.App.2d 640, 644 [79 Cal.Rptr. 491].) Thus, in *Failla,* a conviction for first degree burglary was upheld where one of defendant's feet was on a windowsill and the other was inside the room. In *People* v. *Walters* (1967) 249 Cal.App.2d 547 at page 551 [57 Cal.Rptr. 484], it was held for purposes of burglary, ". . . the entry need not be any part of the body, but . . . an entry may be made by an instrument, where the instrument is inserted for the purpose of committing the felony. [Citations.]" There, defendants were caught on the roof of a building where a grate had been unfastened and a rope was found dangling down into a bathroom.

■ Moreover, California decisions have rejected the invitation to read into the burglary statutes a requirement that a defendant enter premises with the intent to commit a crime "therein." Thus in *People* v. *Wright* (1962) 206 Cal.App.2d 184 [23 Cal.Rptr. 734], the court considered a situation where defendant broke into the office of a tire shop and then stole tires from an adjacent shed that was not a structure protected by the burglary statutes. Rejecting a contention that a burglary could be committed only if a defendant intended to commit a crime on the premises that were entered, the court said, "We consider the true rule to be that within the purview of section 459, Penal Code, the intent to commit larceny or any felony is not confined to an intent to commit the crime in the building which is entered if the intent at the time of entry is to commit the offense in the immediate

vicinity of the place entered by defendant; if the entry is made as a means of facilitating the commission of the theft or felony; and if the two places are so closely connected that intent and consummation of the crime would constitute a single and practically continuous transaction." (*Id.*, at p. 191; see also *People* v. *Nance* (1972) 25 Cal.App.3d 925, 931-932 [102 Cal. Rptr. 266]; *People* v. *Shields* (1945) 70 Cal.App.2d 628, 637 [161 P.2d 475].)

These authorities make it clear that one can commit the crime of burglary of a dwelling without ever entering the dwelling in a way that would impart knowledge of whether it was inhabited or not. Consequently, we cannot imply a requirement of knowledge of inhabitation from the statute's requirement that one must enter a dwelling to commit the crime.

We next examine whether the common law supports the theory that actual knowledge of inhabitation is an element of the offense of first degree burglary. "California codified the law of burglary in 1850. (Stats. 1850, ch. 99, § 58, p. 235.) That statute and subsequent revisions and amendments preserved the spirit of the common law, while making two major changes [not germane to the instant case]." (*People* v. *Gauze* (1975) 15 Cal.3d 709, 712 [125 Cal.Rptr. 773, 542 P.2d 1365].) We have been cited no case, nor are we aware of any, suggesting that a defendant at common law had to have knowledge that a dwelling house was inhabited in order to commit the crime of burglary. At the same time, the common law *did* recognize that a burglary of a dwelling house could be committed even though no one was at home. Thus, Blackstone wrote that "[a] house . . . wherein a man sometimes resides, and which the owner hath only left for a short season, *animo revertendi* (with the intention of returning), is the object to burglary, though no one be in it at the time of the fact committed." (2 Jones' Blackstone (1916) § 261, pp. 2432-2433.) And Perkins writes: "Certain it is that the dweller and his entire household may be away for months, without depriving the house of its character as his dwelling.[4] It was ruled in the 1500's,[5] and often repeated since,[6] that a man may have two dwellings at the same time actually used during alternate periods and that burglary may be committed in the one not being used at the moment,—such as a winter home in the city and a summer cottage in the mountains.[7]" (Perkins on Criminal Law (3d ed. 1982) p. 259, fns. in original.)

---

"[4]Schwabacher v. People, 165 Ill. 618, 46 N.E. 809 (1897). It was over seven months in this case."

"[5]Resolution of Judges, Popham, 52, 79 Eng.Rep. 1169 (1593)."

"[6]1 Hale P.C. *556; 1 Hawk.P.C. c. 38, § 11 (6th ed. 1788); State v. Meerchouse, 34 Mo. 344, 346 (1864)."

"[7]A summer cottage in the dead of winter, when all utilities were disconnected and the furniture was piled up in the middle of the rooms and covered, was a dwelling place within the meaning of the burglary statute. State v. Albert, 426 A.2d 1370 (Me. 1981)." (Perkins on Criminal Law, *op. cit. supra.*)

We conclude that insofar as "the spirit of the common law" (*People* v. *Gauze, supra,* 15 Cal.3d at p. 712) lives on in our current burglary statutes, that spirit brings no help to defendant. Although the common law recognized that dwelling houses could be actually unoccupied for substantial periods of time and still be the objects of burglaries, the common law (so far as we can tell) failed to require that a defendant have knowledge that a dwelling house was being used for residential purposes and had not been abandoned.

Finally, we conclude the burglary statutes may be construed in a reasonable way in the absence of the requirement of knowledge of inhabitation.

It is not to be gainsaid that a burglary of an inhabited dwelling house is a serious crime that is meant to protect important societal policies. Preliminarily, "Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation—the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence." (*People* v. *Lewis* (1969) 274 Cal.App.2d 912, 920 [79 Cal.Rptr. 650].) In addition, a burglary of an inhabited dwelling involves an invasion of perhaps the most secret zone of privacy, the place where trinkets, mementos, heirlooms, and the other stuff of personal history are kept.[15] Society therefore has an important interest in seeing to it that burglars stay out of inhabited dwelling houses.

The current state of the law (which has not recognized knowledge of inhabitation of a dwelling house as an element of first degree burglary) furthers that interest by perpetuating a rule that imposes greater penalties for invasion of a dwelling house that is, in fact, inhabited regardless of the knowledge of the burglar as to whether it is inhabited or not. The rule is hard, fast, and absolute. It signals to second degree burglars (who wish to avoid becoming first degree burglars) that their actual knowledge of the inhabited status of a dwelling house is irrelevant; consequently, if they wish to avoid becoming first degree burglars, they best err on the side of caution in considering whether to enter dwelling houses.

■ In sum, we hold that neither section 459 nor section 460 contains any requirement that a defendant have knowledge that a dwelling house is inhabited in order to commit the crime of first degree burglary. Assuming,

---

[15]Perhaps for that reason, burglary was originally defined at common law as a violation of someone's habitation or living quarters. (See Perkins on Criminal Law, *op. cit. supra,* p. 255 and authorities cited therein.)

arguendo, defendant's instruction was tendered on that theory, it was properly refused.

We emphasize the limits of our holding. In this case, defendant burglarized a single family detached residence. He has never contended that he did not know that he was entering a "dwelling house," i.e., a structure where people ordinarily live. We note that section 221.1 of the Model Penal Code, defining burglary,[16] does not require actual knowledge of inhabitation or occupancy as an element of the offense but provides an affirmative defense that a building or structure was abandoned. However, the comment to section 221.1 makes clear that the statute's absence of knowledge is predicated on the character of the burglarized structure as being one where people are normally present: "Actual presence is not required because the presence or absence of a person in a structure that is normally occupied will often be purely a matter of chance so far as the intruder is concerned. The intruder is ordinarily well able to judge whether the structure is a dwelling, store, factory, warehouse, or other place where people might normally be present. It is enough to require that the structure be one that is normally occupied and that the defendant be reckless as to its character as such. If these requirements are satisfied, the fortuity of a person's actual presence or absence is irrelevant." (II Model Pen. Code, *op. cit. supra*, com. to § 221.1, p. 72, fns. omitted.)

Since the instant case involves a structure in which people are ordinarily present, we have no occasion to examine situations involving structures not likely to provide reasonable warning that people may be living in them.

The remainder of defendant's contentions are dealt with in an unpublished portion of this opinion.

---

[16]"§ 221.1 Burglary

"(1) *Burglary Defined.* A person is guilty of burglary if he enters a building or occupied structure, or separately secured or occupied portion thereof, with purpose to commit a crime therein, unless the premises are at the time open to the public or the actor is licensed or privileged to enter. It is an affirmative defense to prosecution for burglary that the building or structure was abandoned.

"(2) *Grading.* Burglary is a felony of the second degree if it is perpetrated in the dwelling of another at night, or if, in the course of committing the offense, the actor:

"(a) purposely, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone; or

"(b) is armed with explosives or a deadly weapon.

"Otherwise, burglary is a felony of the third degree. An act shall be deemed 'in the course of committing' an offense if it occurs in an attempt to commit the offense or in flight after the attempt or commission.

"(3) *Multiple Convictions.* A person may not be convicted both for burglary and for the offense which it was his purpose to commit after the burglarious entry or for an attempt to commit that offense, unless the additional offense constitutes a felony of the first or second degree." (II Model Pen. Code (1980) § 221.1, pp. 60-61.)

The judgment is affirmed.

Blease, Acting P. J., and Sparks, J., concurred.